The UNIVERSITY RAIL ROAD COMPANY *v.* W. W. HOLDEN, Governor, and D. A. JENKINS, Treasurer of North Carolina.

The Acts of January 30th, 1869, and April 1st, 1869, in regard to "the University Rail Road Company" are invalid; because—

1. By PEARSON, C. J., and READE, DICK and SETTLE, JJ. No corporation is created thereby, and therefore there is no *grantee* to take the franchises specified.

2. By PEARSON, C. J., and RODMAN and DICK, JJ. The question involved therein of an expenditure by the State, has not been decided by a vote of the People.

3. By PEARSON, C. J., The proportions and limitations upon taxation, required by Art. 5, sec. 1 of the State Constitution, have not been observed.

By RODMAN and DICK, JJ., *Conceding* that *an inchoate corporation* is created by the acts in question, the "Directors" required for its consummation have not as yet been duly appointed, inasmuch as to such appointment the State Constitution renders a *confirmation by the Senate*, indispensable.

ARGUENDO:

By the Court, 1. *Galloway* v. *Jenkins, ante* 147, cited and approved.

2. The *proportions* and *limitations* (*ubi supra*) do not apply to taxes laid for the purpose of paying either the interest or the principal of

the public debt, as it existed at the adoption of the Constitution, or for *special county purposes*, (as in Art. 5, Sec. 7, of the Constitution.)

By READE, DICK and SETTLE, JJ. The *proportions* and *limitations* (*ubi· supra*) apply only to taxes laid for the ordinary and current expenses of the State, and include none of .the objects of expenditure referred to in Secs. 4 and 5, of the same Article.

By PEARSON, C. J. They apply in all cases of State or County taxation, except provisions, (1) for the public debt as it existed when the Constitution was ·adopted, (2) for casual deficits, insurrection and invasion, and (3) county taxation for *special purposes*.

By RODMAN, J. They apply (except in regard to the public debt as it existed at the adoption of the Constitution) equally in regard to all State taxes whatever, but not with equal force to all; being, in some matters, *imperative;* in others, only *directory* to the Legislature,— whose decision in such case is conclusive, and cannot be reviewed by the judiciary. In this latter class are included, taxes, (1.) to supply casual deficits, to suppress invasions and insurrections; (2.) for the ordinary and legitimate purposes of the State, and (3.) to construct unfinished Rail Roads.

By PEARSON, C. J., and RODMAN and DICK, JJ. (*Dissentiente*, READE, J.) As the Legislature cannot give or lend the credit of the State to others, for the purpose of constructing new Rail Roads, without the sanction of a vote of the people, *so a fortiori*, it cannot without such sanction, engage in such construction *directly*.

MANDAMUS, tried before *Watts*, J., at Spring Term 1869, of the Superior Court of WAKE.

The petition, filed at the same Term, in the name of "The University Rail Road Company," set forth that the petitioner was a corporation created by An Act ratified January 30, 1869, as amended by another Act ratified April 1st, 1869, for the purpose of constructing a rail road between Chapel Hill and a certain point on the line of the North Carolina Rail Road. And, amongst other things, it alleged that the acts above, provided that it should be the duty of the Governor and the Treasurer of the State to prepare and issue to such company for the purpose of constructing its road, bonds of the State to the amount of three hundred thousand dollars. That a special tax to provide for the ·interest was laid, and under the pro-

visions of these acts the plaintiff was entitled to have the bonds issued; but that the Governor and Treasurer, upon being applied to, refused to have them prepared and issued.

The prayer was for a Mandamus, to be directed to W. W. Holden, as Governor, and D. A. Jenkins, as Treasurer, &c.

The writ for an alternative mandamus having been issued returnable upon the 15th day of April, during the same term, and service thereof having been accepted by the defendants, upon its return, His Honor ordered a peremptory writ to be issued; and the defendants appealed.

*Attorney General* and *Pou*, for the appellants.
*Haywood, Fowle & Badger*, and *Person, contra.*

Pearson, C. J.  I.  I incline to the opinion that the act entitled "An act to incorporate the University Rail Road Company," does not have in law the effect to create a corporation.  To give legal effect to a grant, there must be a grantor, a grantee, and a thing granted.  Here we have a grantor, the General Assembly; a thing granted, corporate powers and franchises "to the same extent as are possessed by the North Carolina Rail Road Company;" but there is no grantee—no person, persons, or body politic to whom the grant is made. If this be so, it would seem to follow, that the Directors who are to manage the affairs of said "University Rail Road Company" (there being in contemplation of law no company) cannot have such rights as are enforced by the writ of *mandamus.*

II. In my opinion, by the proper construction of Art. V, Sec. 5 of the Constitution, the General Assembly has no power to contract a debt to build a *new* railroad, unless the subject be submitted to a vote of the people.  It is decided (*Galloway v. Jenkins, ante* 147) that the General Assembly has no power to contract a debt, without a vote of the people, *to aid* in the construction of a new railroad.  If the General Assembly has no power to contract a debt for the purpose of building a new railroad, with the assistance of contributions by

individuals, county subscriptions, and subscriptions by other railroads, it would seem it cannot have power to contract a debt for the purpose of making a new railroad out and out. A prohibition not to contract a lesser, surely amounts to a prohibition not to contract a greater debt, for the same object. The evil which the Constitution seeks to prevent is not that of giving aid to individuals or corporations in the construction of railroads; but, that of contracting *new* debts on the part of the State, the existing debt being almost too heavy to bear, and the credit of the State tottering under the load. A construction by which new debts may be contracted on a larger scale than one expressly prohibited, is not admissible upon any principle of law. As this is a deduction from *Galloway v. Jenkins*, in which the Court was divided, I will put my conclusions also on the construction of all the provisions of Art. V.

III. The act under consideration is in violation of the Constitution in this: the tax levied by it disturbs the proportion which, by the Constitution, capitation tax must bear to the tax on the value of property, to wit: " *The tax on a poll shall be equal to the tax on three hundred dollars worth of property."* Here we have the proportion. Then follows a provision: "The State and County tax combined, shall never exceed *two dollars on the head,"* and the necessary effect is, that the State and county tax on the value of property shall never exceed two dollars on three hundred dollars worth of property; and the effect also is, that if the tax on a poll is less than two dollars, then the tax on three hundred dollars worth of property must be less in the same ratio. In other words, the tax on the poll is *"the standard"* by which the tax on property is to be levied.

*Under two dollars,* the power to levy a poll tax for State purposes is unlimited; *this interest* needed no protection, for it has a full representation in the General Assembly.

*Counties* are protected by Sec. 7, which provides "taxes levied for county purposes shall be levied in like manner with the State taxes, and shall never exceed double of the State tax except for a special purpose and with the special approval of the General Assembly. 27

*Cities, towns and townships* are protected, (Art. VII, Sec. 7,) which provides "no debt shall be contracted, nor shall any tax be levied except for necessary expenses, unless by a vote of a majority of the qualified voters therein.

The only remaining interest is that of *property holders,* in respect to State and County taxes. This interest is protected by the equation fixed between capitation tax and the tax on property. A statute which disturbs this equation breaks down the safeguard thrown around property by the Constitution. If it can be done to the extent of one hundredth of one per cent, it may be done to the extent of one tenth, and there is no limit.

It was said in the argument, that this equation applies only to taxes levied for current expenses of the State and counties, and has no reference to taxation necessary to pay the interest on the public debt, or the tax to be levied to pay the interest on any new debt.

1. I agree that if, under this equation, carried to its limits, the amount is not enough to meet current expenses, and also to pay the interest on the public debt, then for the excess needed it is not only within the power, but it is the duty of the General Assembly to disregard the equation; for this protection to property must be taken to be subject to the injunction, "to maintain the honor and good faith of the State untarnished in regard to the public debt, [Art. I, Sec. 6,] and by Sec. 4 of the Article under consideration, it is ordained: "The General Assembly shall, by *appropriate legislation and adequate taxation,* provide for the payment of the interest on the public debt, and after 1880 it shall lay a special annual tax, as a sinking fund, to discharge the principal." I do not adopt the entire position taken by Mr. Haywood, that by a *specific* tax is meant a tax on land by the acre, or on horses and cattle by the head. It is enough to admit that this tax is to be independent of the equation; as in Sec. 7, a tax for special county purposes, with the special approval of the General Assembly, may be levied without reference to the equation.

2. I do not agree to the position, that the tax required by

Sec. 5, to be levied to pay the interest on any new debt, is not subject to the equation; and that the power to tax property in reference to *new debts is unlimited*, save by the discretion of the General Assembly. There is nothing, as we have seen there is in the case in regard to taxation to meet the interest and principal of the existing debt, to take this taxation out of the equation. Its being called a *special* tax cannot have that effect; for Sec. 8 requires that every act shall state the special object to which the tax is to be applied. On the contrary, it is included in the equation by every rule of construction.

This fixed equation between poll tax and property tax, gives significance to the provisoin the first clause of Section 5: "No new debt shall be contracted in behalf of the State, *unless in the same bill a special tax* is levied to pay the *interest annually*.

If the purpose was simply to keep up the price of State bonds, this would amount to but little, as such a tax is very easily inserted in a bill;—but suppose the purpose to be to restrain the power of taxation in regard to property by reference to the equation before fixed, so that the special tax on property cannot be levied, without making a corresponding increase in the capitation tax, and this proviso amounts to a very important practical limitation on the power to tax property, and must have a very decided effect in checking a disposition to contract new debts.

And the exceptions in regard to "supplying a casual deficit," and for "suppressing insurrection or invasion," in which cases the equation may be disregarded, speak volumes, and show that more was intended, in requiring a tax to be levied in the *same bill*, than simply to put the draftsman to the task of adding a clause to the bill. It is only in *exigencies* that this safeguard to property is not to be observed.

Except out of the operation of Sec. 1, the taxation that may be "appropriate and adequate" to meet the interest and principal of the existing debt; except also out of its operation the taxation necessary to meet the interest and principal of such new debts as shall be contracted in behalf of the State, and the effect will be to emasculate the section and fritter it away to nothing. Only current expenses are left for it to operate on;

and these expenses may be met by the tax on trades, professions, franchises and incomes (Sec. 3,) which are not embraced by the equation. So, by the construction contended for, this supposed protection to property holders is made void and illusory, and, after all, amounts to nothing.

On the argument, it was urged that the bill levying this tax on property to pay the interest on the debt to. be contracted for the University Rail Road, was passed several days *before* the bill called "The Revenue Act," which fixes the capitation tax at 105 cents on the head and the property tax at 35 cents on the $100 worth, observing the equation of taxation; and if this equation must be adhered to, the effect will be either to nullify all of the taxation of the session, or to displace *pro tanto* a part of the tax on property in the Revenue Bill, in order to make room for the tax in the University bill—inasmuch as *"qui prior est in tempore,"* &c.

I do not concur in either of the conclusions. All of the bills at the same session are to be taken together. The Revenue Bill being in exact accordance with the Constitution, must take effect, and it specially appropriates the amount to be raised under it, to the annual expenses of the State government, and to the payment of the interest of the public debt. So the scope of the legislation is: If the General Assembly has power to lay a tax to pay the interest on the debt for the University Rail Road without being limited by the equation, then the tax is to be levied, Otherwise, it will fail, as being levied *ultra vires,,* and because the General Assembly assumes an unlimited power of taxation.

Several cases were supposed in the argument, but they all involved the fallacy, that the General Assembly and County Commissioners have an independent power to tax property to the extent of 66⅔ cents on the $100 value, whereas there is no such power, and the right to tax property depends on the cap·itation tax. Both must be exercised jointly, in order to preserve the equation of taxation.

PER CURIAM.                    Order below reversed, and
                               petition dismissed.

Reade, J. I agree with the Chief Justice, that no corporation is created by the act, and, that therefore, the mandamus must be dismissed.

I do not agree with him and my learned brothers, Rodman and Dick, that the Legislature has no power to contract a debt to build a new Rail Road without a vote of the people; but I do agree that the Legislature has no power to *give* or *lend* its aid *to others* to build a new Rail Road without a vote of the people. In so far as the questions discussed in this case, are involved in the case of *Galloway* v. *Jenkins*, (*ante*, 147.) I feel myself bound by that decision, although I did not concur in it. But I am wholly unable to comprehend how it follows, that because the State cannot *lend* its aid to others to build a Rail Road for *their benefit*, that, therefore, it cannot build a Rail Road out and out, for *its own benefit !* If the Constitution forbade the Legislature to lend the aid of the State to New York to build a State House or Penitentiary for New York, would it be supposed, that, therefore, the Legislature could not build a State House or Penitentiary, " out and out," for North Carolina ? Or would it be supposed that this view was answered by the argument, that the greater includes the less, and if it cannot build a Road with the aid of others, it cannot build one without such aid ? It is said that the object was to prevent the Legislature from contracting new debts. And yet it is admitted that it may contract new debts for other purposes than Rail Roads. If the object was to keep the State from going in debt, why not keep it from going in debt for *other* purposes? " If a farmer have a field requiring a fence on three sides, would it do any good to fence it on only two sides?" But I will not pursue the matter further. And I purposely refrain from approving or disapproving the internal improvement policy, because it is not a Judge's province to do so. I only seek to expound what has been done by the Constitution and by the Legislature. If the law-makers have erred in matters of policy, the remedy is with the people.

My construction of the taxing power of the Legislature, under the Constitution is as follows:

1. The first object of the Convention, in the 5th Art. of the Constitution, was to provide for the ordinary and current expenses of the government. That is done in sections 1, 2, and 3. And for that purpose the tax is limited to $2 on the poll, and the same amount on $300 worth of property, and the equation must be observed. This was thought to be sufficient for the ordinary and economical administration of the government.

2. We had a considerable public debt, and, after providing for current expenses, the next consideration was, how is the public debt to be met? And the 4th section provides, that a special tax shall be laid for that.

In regard to the construction of the first four sections, I do not understand that there is any difference of opinion among the Judges, except it may be as to what constitutes "the public debt."

3. Taxation is not the subject of the section except incidentally. Having provided in sections 1, 2, and 3 for ordinary expenses, and in section 4 for the public debt, the next consideration was, to provide for extraordinary occasions. And for such occasions the 5th section provides, not that taxes shall be laid, but that bonds shall be issued; and, as incident to the bonds, special taxes may be laid, not to pay the bonds, but only the interest, leaving the bonds as a part of the public debt, to be provided for under section 4. The power to issue these bonds is unrestricted. From the very nature of the case it must be so. If an extraordinary and unforseen occasion is to be met, how is it possible to limit the means unless you foreknow the occasion? If there be an insurrection, bonds must be issued to meet it; but whether a large or small amount, must depend upon whether it be a large or small insurrection, and so with any other occasion. It ought not to be supposed, that a Constitution would be framed with such limitations upon the taxing power, as that the vessel of State will sail safely in fair weather, to be

wrecked in the first storm. We may well impute it to wisdom, to provide that ordinarily there shall be light taxes and economy in expenditures, but when any extraordinary necessity arises, the whole power of the State must be unloosed to meet it. It is admitted that the counties, for special purposes and with the approval of the Legislature, may, under section 7, levy a tax without limit and without a vote of the people. It was supposed that extraordinary necessities may fall upon a county. And may not extraordinary necessities fall upon the State? It need not be inferred that either county or State taxes will be excessive because the counties and Legislature have the *power* in extraordinary cases to make them so. Until the new Constitution, there was no restriction whatever upon the power of the Legislature to tax; and yet the taxes were never burdensome. There was supposed to be a sufficient check in the accountability of the representative to his constituents. The restriction in our new constitution is deemed a wise one—induced, probably, by the new order of things, and intended to protect the non-property holder from an oppressive poll tax, and the property holder from an unequal property tax, for the ordinary purposes of the government.

I admit that the Legislature cannot give or lend anything to Rail Roads which belong to others, without a vote of the people; but if any extraordinary occasion or necessity arises, the Legislature may do anything for the State which the occasion may require—may issue bonds at par without limit and without tax, and issue them below par with a special tax. For any abuse of this power the representative is responsible to the people. All that the Court can say is, thus is it written in the Constitution.

RODMAN, J. This petition is filed by the University Rail Road Company, claiming to be a corporation, to compel the Governor and Public Treasurer to issue to it certain bonds of the State as required by an act of Assembly ratified 30th January, 1869, amended by an act ratified 1st April, 1869.

The Judge below granted a peremptory mandamus, and the Respondents appealed.

The first question is, Who is the petitioner, and has it a legal capacity to demand relief of the nature prayed for?

Section 1 of the Act of 30th January, 1869, enacts: "That there shall be a body corporate and politic, known as the University Rail Road Company, with corporate powers and franchises to the same extent as are possessed by the North Carolina Rail Road Company."

Section 2 requires the Company to build a Railroad from some point on the North Carolina Railroad to Chapel Hill.

Section 3. "The affairs of said University Railroad Company shall be managed by a Board of five Directors, to be appointed by the Governor of the State, which board shall, out of their number, choose a President." &c.

Section 4. "The Board of Directors shall appoint their officers and fix their compensation, and the salary of the President, subject to the approval of the Governor.

Section 5 provides for the issuing, by the Treasurer of the State, to the President of the Company, of bonds to the amount of $300,000, to be signed by the Governor and countersigned by the Treasurer.

Section 6 authorizes the Board to make certain contracts for building the road, and for the use of the rolling stock of the North Carolina Railroad Company.

Section 6 levies a tax of one-hundredth of one per cent on all the property in the State, to pay the interest on the bonds. The amendment of 1st April only changes the number of Directors to seven.

Without any minute criticism on this Act, it may be conceded to the petitioners, that its effect was to create an inchoate corporation, to consist of certain persons to be named by the Governor, to act as agents and for the exclusive benefit of the State in building the Rail Road, and that on the appointment of these persons, the corporation became perfect. This concession, however, is made subject to the consideration whether the persons thus to be appointed by the Governor

were not public "officers," and if so, whether such appointment was invalid for want of confirmation by the Senate under Art. III, Sec. 10 of the State Constitution.

I concede also to the petitioners, for the sake of the argument, that public agents of this sort (if rightfully appointed,) may maintain *mandamus* against the Governor, to compel him to perform a mere ministerial act necessary to enable them to perform their public duties.

With these concessions there will remain but two questions preliminary to the consideration of the main questions in this case.

The main questions are :

1. As to the constitutionality of the act of Assembly in reference to Art. V, Sec. 5, of the Constitution.

2. Whether the Act is unconstitutional in reference to Art. V, Sec. 1, of the Constitution.

The preliminary questions are :

1. The Constitutionality of the appointment of the Directors by the Governor without confirmation by the Senate.

2. Whether the act of which it is sought to enforce the performance, is a mere ministerial one, or one in which the Governor has a discretion; in which last case it is admitted *mandamus* will not lie.

As to the first preliminary question :

The Constitution, Art. III, Sec. 10, says, "The Governor shall nominate, and by the advice of a majority of the Senators elect, appoint *all officers* whose offices are established by this Constitution, *or which shall be created by law,* and whose appointments are not otherwise provided for, and no such officer shall be appointed or elected by the General Assembly." Were the Directors "officers" in the sense of this section of the Constitution? If they were, it is clear they were created by law subsequent to the Constitution; and then the only question remaining for consideration under this head would be, whether the words "whose appointments are not otherwise provided for," mean, otherwise provided for by the Constitution, or, otherwise provided for by the law creating them.

Were these Directors, "officers?" In 7 *Bacon's Abridg. Title, Offices and Officers, p.* 280, it is said: "any man is a public officer who hath any duty concerning the public." *In U. S. vs. Hartwell,* 6 Wall, 385 it is said, "An office is a public station or employment conferred by the appointment of government. The term embraces the ideas of tenure, duration, emoluments and duties," and it was held, that the clerk of an assistant treasurer, was an officer within the meaning of a highly penal act. In *State ex. rel. Worthy vs. Comm. of Moore county, ante,* 199, this Court recently had occasion to consider who were officers of the State, under Amendment XIV of the Constitution of the United States.

In that case the Court, without professing an exhaustive enumeration, included under that definition such persons as standard keepers, stray valuers, entry takers, inspectors of flour, county surveyors, county trustees, &c. But that decision proceeded greatly upon those persons being required by law (Rev. Code, ch. 66) to take an oath to support the Constitution of the United States, a ground which would not be applicable here. There are, however, two sections in the State Constitution from which it may be gathered what kind of State agents that instrument intended to class as "officers." Art. XIV, Sec. 5 says: "In the absence of any contrary provision, all *officers* in this State, whether heretofore elected, or appointed by the Governor, shall hold their positions only until other appointments are made by the Governor," &c. All other officers having been elsewhere provided for by the Constitution, there was nothing for this section to operate on, except the class of State agents to which these directors belong, viz : such as the directors of the several Asylums (Rev. Code, ch. 6) and the State directors in the various banks and rail road companies in which the State had stock ; and we know, that in fact, it was applied to these without any question of its propriety. Art. XIV, Sec. 7 says: "No person shall hold more than one lucrative office under the State at the same time; Provided, that Officers in the militia, Justices of the Peace, Commissioners of public charities, *and Commissioners*

*appointed for special purposes*, shall not be considered officers, *within the meaning of this section*," thereby implying that commissioners for special purposes were " officers," within the meaning of the Constitution elsewhere, and that special words of exclusion were necessary in the particular case.

Then what is the meaning of the words, "unless otherwise provided for," in section 10 ? It seems clear that they mean "unless otherwise provided for in the Constitution." For nearly every officer the Constitution expressly provides the manner of appointment, but its framers seem to have apprehended that some might have been omitted, and, therefore, put in this general clause to cover all others. To read the words as applying to the Act of Assembly creating the office would make them useless, for, in the absence of all constitutional provision on the subject, such would be law; for in such absence the General Assembly, in creating an office, surely might prescribe how it should be filled. Moreover this meaning would seem to be absolutely excluded by the words; "and no such officer shall be appointed or elected by the General Assembly," where "appointed" must refer to an appointment by the Governor alone.

Second preliminary question : Is the act which is required to be done a merely ministerial one ? It is conceded that if the respondents, may exercise a discretion in respect to it, its performance cannot be compelled by mandamus. The act is merely ministerial in its nature; but it seems to me that the time for its performance is left discretionary. It will be observed that the language of section 5 of the act of the 30th January, 1869, is not imperative. It says: " To secure the completion of said road, coupon bonds of the State are hereby authorized to be issued," &c. If we give to this word its proper weight, it can hardly be supposed that the Legislature intended to make it imperative on the Governor and Treasurer to issue in one mass bonds to the amount of $300,000 immediately on the passage of the act, and without any regard to the price at which they could be sold. It could never have been intended that the State should be thus made the victim of the

brokers of Wall Street without help from any quarter. The language was, therefore, purposely, permissive only, and the intention was that the Governor should put these bonds on the market, only as funds might be needed for the work on the Road, and only when in his opinion the price offered was a reasonable one. That discretion he has exercised by refusing to deliver them at this time.

I conclude from these considerations, 1st. That the Directors of the University Rail Road Company were such public officers as required confirmation by the Senate; that the appointments, having been made by the Governor alone, were invalid, and that consequently the inchoate corporation contemplated by the Act has not yet been perfected, and that there being no person *in esse* entitled to receive the bonds spoken of in the Act, the Respondents could not lawfully issue them: 2nd. That the act to be performed was purposely left discretionary as to the time of its performance, and hence cannot be commanded by this Court.

As these views dispose of the present case, we might decline to go farther into the consideration of the main questions which have been argued. But aware, as we are, that the principal object of this suit was to obtain the opinion of this Court on the constitutionality of that part of the Act of 30th January, 1869, which authorizes the issue of State bonds to build the University Rail Road, and on the constitutional limit of State taxation; and aware, also, of the profound interest with which both of these questions are regarded by the people of the State, and of the important consequences which will result from our decision, the Court is not willing, when it has formed a decided opinion, to avoid its expression, and permit the case to go off on matters in which it may be possibly amended hereafter.

The first of the two main questions mentioned above, arises under Art. V, Sec. 5, of the Constitution. It is conceded that the power of the General Assembly to borrow money to build a Rail Road, is not prohibited by the first clause of that section, provided a tax be levied in the same bill, and, provided, the constitutional limitation, if there be one applicable, is not

exceeded. But the second clause forbids the General Assembly "to give or lend the credit of the State in aid of any person, association or corporation, except to aid the completion of such Rail Roads as may be unfinished at the time of the adoption of this Constitution," unless it be submitted to a vote of the people. It will probably be conceded that the clause intended in general to prohibit the credit of the State from being given *"in aid"* of any new Rail Road. But it is contended that here the State does not act "in aid of" any one. It proposes to build the road through its own agents, entirely with its own means, and for its own exclusive benefit. I admit that the act here contemplated to be done, is not *literally* prohibited, but, in my opinion, it is prohibited by a natural and reasonable, and, therefore, necessary construction of the terms used. That cannot be done indirectly, which cannot be done directly. A prohibition to go one mile in a certain direction, is a prohibition to go two; a prohibition to spend one dollar for a certain purpose, is also a prohibition to spend more than one dollar; and a prohibition to render any aid to another in doing a certain act, must by all reasonable rules be construed as a prohibition against doing the act at all. In *Dwarris on Statutes*, 737, citing *Bacon's Maxims*, it is said: If the Statute, 1 Ed. 6, had been, that he that should steal one horse, should be ousted of his clergy, then there had been no question at all if a man had stolen more horses than one, but that he had been within the statute, for *omne majus continet in se minus*. To hold that when the General Assembly is solemnly prohibited from using the credit of the State in giving the slightest aid to any one else in the building of a Rail Road, it may, nevertheless, use that credit to build the whole road; that when it is forbidden to impose any part of the burden on the people, it may impose the whole, would seem to be the exercise of an uncommendable astuteness to explain away to nothing, solemn language intended to be the bulwark of the people's rights.

The rules for the construction of statutes (and the Constitution is a statute of the highest class) are clear and settled. If an adherence to the letter will lead to an absurdity, or will

defeat the plain intention, the literal construction must be departed from. To cite the well known instance: A statute enacted that any person who drew blood in a public street should be punished capitally; a person walking in the street was taken with a fit, and fell; a surgeon near by bled him on the spot, and restored him to health; did the surgeon violate the spirit of tne statute? To illustrate still farther the danger of a too literal construction: Suppose the word "person" had been left out of the second clause of Section 5, could the Legislature, in that case, have given the credit of the State to a single person in aid of a Rail Road? Or, suppose the word, "person" had been retained, and the word "association" had been omitted, could it have given it to a partnership of several persons? It will scarcely be contended that the omission of either of these words would make any difference in the spirit and meaning of the section, yet by a strictly literal construction, the difference would be very great. It is to be observed, too, that this is not a penal statute, and, therefore, to be strictly construed, but one reserving rights to the people; and Sec. 27 of the Declaration of Rights, prefixed to the Constitution, says: "All powers not herein delegated remain with the people;" it must, therefore, receive a liberal construction to advance the remedy and suppress the mischief. In the construction af a new statute we must look at the old law; the mischief, and the remedy intended to be applied.

The old law here was that the Legislature could contract an unlimited State debt, and by the abuse of this power for works of internal improvement, threatened the bankruptcy and dishonor of the State, and the ruin of the people; the remedy intended was, to restrict the power of the Legislature to incur debts, and as the building of rail roads had been the most fertile source of the abuse, to restrict it especially in reference to that, by requiring the previous sanction of the people.

The same reasons which made it proper for us to consider the constitutionality of the Act of 30th January, 1869, in reference to the section of the Constitution just discussed,

induce us to consider it also as affected by Section 1 of the same Article. Section 1 says: " The General Assembly shall levy a capitation tax on every male inhabitant of the State " between certain ages, " which shall be equal on each to the tax on property valued at $300 in cash," "and the State and County capitation tax combined, shall never exceed two dollars on the head." It is too plain to admit of an argument, that the intent of this section was to establish an invariable proportion between the poll tax and the property tax, and that as the former is limited to two dollars on the poll, so is the latter to two dollars on the three hundred dollars valuation of property. The motives for such a limitation may be inferred from the provisions of the Constitution itself, without looking at the debates in the Convention, to which we were referred. The Constitution admitted to the suffrage a class of persons who had never been entitled to it before, equal in numbers to about one half of the former voting population, and this class was at that time almost universally destitute of property. It was foreseen as at least possible in the somewhat unnatural condition of things then existing, that whichever of these two powers should obtain a majority in the Legislature, might attempt to put on the other an undue portion of the public burdens through taxation; to prevent the confiscation of property by numbers, a proportion was established; to prevent the oppression of numbers by property, the poll tax was limited. This proportion and this limit apply equally to all State taxes whatever, but not with equal force. As to some, it is absolutely imperative, and a tax laid contrary to its provisions would be void. As to others, from the nature of the objects of the tax, and from the provisions of the Constitution, it seems to me to be merely directory; that is to say, addressed to the discretion of the Legislature, and to be regarded, if possible, consistently with the attainment of the great objects of the Constitution, but if these cannot be attained within the limits and proportions prescribed, then to be disregarded. And of this possibility the Legislature must necessarily be the exclusive judge. The important question is, what are the exceptions from the general rule:

1. It seems to me that the interest and principal of the public debt which existed at the adoption of the Constitution, and which was not repudiated as having been incurred in support of the rebellion, is clearly an exception. The Constitution, in respect to the debt of the State, shows a manifest intention that what was then owing should be secured and finally paid, and that it should not be increased for any but the most necessary purposes, (or such as were supposed to be so,) and then only under such guards and restrictions as would, it was believed, suffice to insure economy and moderation. Section 6 of the Declaration of Rights renews the pledge of the faith of the State to the payment of the existing debt; and Sec. 4, of Art. V, provides for the prompt payment of the interest, and the eventual payment of the principal, by a tax on the property of the State. When we consider the uncertainty which must necessarily have existed as to whether taxation within the limits prescribed by Sec. 1 would suffice for these cherished purposes, and that the tax to effect them is to be laid on property alone, thereby entirely disregarding the proportion established by Section 1 between property and polls, we are forced to the conclusion that Sec. 4 was intended to be in all respects independent of Sec. 1, if it should be found necessary to render it so, in order to give it due effect. If due effect can be given to it consistently with the general mode of taxation by *ad valorem* prescribed in Sec. 3, and with the limit prescribed in Sec. 3, and in Sec. 1, then those general provisions were to be observed; but if that could not be done, then, on the principle that a special provision overrides, in the particular case provided for, all merely general rules, the general rule must be disregarded. I cannot concur, therefore, with Mr. Haywood in his view of the meaning of the word "specific" in Sec. 4. He considers it as contradistinguished from *ad valorem*. That may be its technical and usual meaning in Acts of Congress relating to duties on imported goods, but in this place it means merely a tax devoted to the specified purpose. The accomplishment of the purpose proposed in Sec. 4 does not require any deviation

from the general rule of uniform *ad valorem* taxation, and, therefore, none can be admitted.

2. Sec. 5 permits the Legislature to contract new debts in behalf of the State: 1st. To supply a casual deficit, or to suppress insurrection or invasion, whether the bonds of the State are at par or not, without levying a special tax to pay the interest. 2nd. For the ordinary and legitimate purposes of State government; if the bonds are at par, without levying such a tax. 3rd. To aid in the completion of such Rail Roads as were begun and unfinished at the adoption of the Constitution. For all other purposes they are forbidden to contract any new debt without submitting the question to a vote of the people. These objects of permitted taxation are distinguished from each other by the character of the conditions imposed on them respectively, and by the greater facility with which debts may be incurred for one of the purposes than for another. To suppress invasion, &c., the Legislature may contract a debt without levying a tax to meet the interest: for other legitimate but not equally pressing uses of the State (including the aid to unfinished Rail Roads) it cannot. But all these objects are embraced in the same section, and as respects their liability to come within the operation of the limitation in Sec. 1, they all stand on the same footing. No distinction in this respect is made; if the State cannot exceed the limitation for one of the objects, it cannot for another. We can scarcely suppose that the Constitution intended to cripple the power of the Legislature in borrowing money to suppress invasion. The limit of taxation might have been already reached; and in that case it would be impossible for the State to borrow, as it could not tax to pay either the interest or the principal, and there is no provision in such a case for leaving the question to the people. This consideration of itself will suffice to prove that as to the taxation permitted by this Section, the limitation in Sec. 1, is not applicable. It must be noted however that in this Section, (5) there is no such command, as there is in Sec. 4, that the tax raised for the objects embraced shall be levied on property

28

alone. On the contrary, the Legislature is left at liberty to levy the tax as it may think best, either on property, or polls or on purchases, &c., or on all combined, subject only to the qualification, which there is no power to dispense with, that the tax on property shall be uniform and *ad valorem.* I am therefore of the opinion that the limitation of taxation prescribed by Sec. 1, is not imperative as respects taxes laid for the purposes contemplated in Sec. 5: that it must of necessity be construed as only directory or monitory to the Legislature, and that its observance cannot be enforced by the Courts.

The view which I take of the constitutional powers of the Legislature may possibly be unsatisfactory to two classes of persons; to those who are interested in the construction of new rail roads, and those who imagined that the Constitution had imposed an absolute limit to taxation for all purposes. By both it should be remembered that it is not the duty, or within the power of the Judges of this Court to make the law, but simply to declare it as they may conscientiously find it to have been made by the legislative representatives of the people. To the first class it may be further suggested, that if the roads in question are so necessary to the welfare of the State as to make their construction at this time, and under the present circumstances, wise and judicious, it is not probable that the people will refuse that sanction which they have retained the right to give or refuse, and which, if given, avoids all further question. To the second class it may be suggested, that the attempt to limit the legislative power of taxation in the manner of this Constitution is altogether novel, and if a short experience has shown it to be wise, it is entitled to the credit of being original; that no constitutional restrictions, however skilfully drawn, can ever form an effectual barrier to the effects of legislative folly or venality; that if legislators necessarily are entrusted with great powers over the estates of their constituents, the possession of such power should lead to an increased care in selecting them; and finally that by the construction which I have endeavored to maintain, the two chief objects of the Constitution in reference to this subject will

have been attained,—the security of the existing State debt, and (except under the most extraordinary circumstances) an absolute and certain limit to its future increase.

I have purposely refrained from discussing any of the questions which in the arguments of counsel were suggested as possible, arising out of the possible priority of passage of tax bills for purposes not of primary importance, over those which were, and also of questions which might arise in case the Legislature should wantonly absorb the full limit of taxation for State purposes, leaving no margin to the counties for their necessary objects. These do not naturally arise out of this case. With the wise and patriotic legislation which we may hope for, and with that due obedience to the monitory, as well as to the imperative parts of the Constitution, which the people have a right to expect, it is scarcely possible that such questions can ever arise. It would be unwise and not in conformity with the practice of this Court, to undertake to decide them in advance.

In my opinion the judgment of the learned Judge below should be reversed and the complaint dismissed.

DICK, J. The important questions which are involved in this case were ably discussed by counsel, at the bar, and they have been maturely considered by the Court. I concur with the other Justices in believing that the act incorporating the University Rail Road Company, is unconstitutional, and the reasons for such opinion are fully stated by Chief Justice Pearson and Justice Rodman. The difference of opinion upon the Legislative power of taxation has caused some delay in the decision of this case. I think it proper to state the conclusions at which I have arrived, without attempting any elaborate argument on the subject.

The power of taxation is one of the chief attributes of sovereignty, and no constitutional government can exist without it. In republican governments the usual safe-guard against the abuse of this power, is the responsibility of the legislature to its constituents. Until the formation of our present gov-

ernment no other safe-guard against unjust and oppressive taxation was placed in the Constitution of this State.

When the Convention of 1868 met to re-model our State government, it saw proper to impose some constitutional restrictions upon the Legislature in relation to the exercise of this power.

We must suppose that the framers of our government did not intend by these restrictions to limit the Legislature in such a manner as to prevent it from sustaining the honor and credit of the State, providing for the exigencies of the government, and advancing the best interests of the people. We ought to consider the circumstances by which the Convention was surrounded, and construe these restrictions with due libe_rality. It seems to me that the Convention in framing that part of the Constitution which relates to taxation had several objects in view.

The first object was to secure the honor and credit of the State. There was a large State debt which had been incurred in developing the resources of the State; and not only common honesty, but good policy required that it should be secured, and the accruing interest promptly paid. For the purpose of gaining public confidence, the solemn assurance was placed in the Declaration of Rights (Art. 1, Sec. 6,) that the State debt "shall be regarded as inviolable and never be questioned;" and then to meet this obligation the imperative duty was imposed upon the General Assembly to make provi sion for its payment "by appropriate legislation and adequate taxation." (Art. 5. Sec. 4.) Upon a question in which the honor and credit of the State are involved, we cannot believe that any restrictions are placed upon the Legislature which would in any manner prevent it from promptly performing an imperative duty.

The object of the Convention in Art. 5, Sec. 1, was to provide a system of general taxation for the ordinary expenses of the government, which is to operate with a just equality upon the citizens and property of the country. The capitation tax is limited to two dollars on the head, and for the pur-

poses of general taxation, the tax on three hundred dollars worth of property cannot exceed that amount. Sections 1, 2, and 3, establish a general revenue system for the State; and sections 4, and 5, provide special taxes for the State indebtedness, unexpected exigencies, and for the completion of unfinished railroads.

The object of section 5, was to place a restriction upon the increase of public debt until the bonds of the State shall be at par. This restriction cannot, under any circumstances, extend to a debt incurred for a casual deficit, or for suppressing insurrection or invasion; and when the bonds of the State are at par, the restriction ceases as to all new debts *in behalf of the State.*

· The restrictions in this section require the Legislature to provide for the payment of the interest of any new debt incurred by a special tax. As to this tax the Legislature becomes directly accountable to its constituents, and this is, in general, a sufficient security against improper legislation in a republican government where elections are free and frequent. This section does not regulate taxation, but provides the manner in which new debts are to be incurred for the general welfare of the people. The Convention evidently contemplated the necessity of incurring new debts, outside of the ordinary expenses of the government; and if the State credit had been at par no restriction would have been placed on the Legislature in this respect. The debts to be incurred are to be "in behalf of the State," and for the benefit of all citizens, and not for any special locality or section.

When the State can get par value for its bonds, and expends the money for the equal benefit of all its citizens, then there can be no impolicy or danger in using it credit for such purposes. The debt is incurred by all for the benefit of all. The special tax mentioned in this section must be *adequate* for the purposes intended, and cannot be regulated and restricted by Section 1.

· In my opinion, no new rail road can be built with State aid unless the subject is submitted to a vote of the people, &c. · (Art. V, Sec. 5.)

434    IN THE SUPREME. COURT.

If it was intended that the special taxes mentioned in Sec-
tions 4 and 5 were to be restricted by the equation established
in Sec. 1, then we must believe that the Convention either
greatly over estimated the sources of taxation, or was not
honest in its solemn pledge, "to maintain the honor and good
faith of the State untarnished," and was so unwise as not to
provide for emergencies which might arise in the administra-
tion of the government. I am not disposed by a narrow con-
struction of Article V of the Constitution, to cast such impu-
tations upon the framers of our government. I cannot believe
that the Convention intended to make the very existence of
the government dependent upon a certain equation of taxation.

The power of the Commissioners of a County to levy taxes,
is limited and regulated by Art. V, Sec. 7, and Art. VII, Sec.
7, as follows:

1st. County taxes shall be levied in the same manner as
State taxes.

2d. Such taxes shall never exceed the double of the State
taxes, except for a special purpose.

3d. Taxes for a special purpose must have the special appro-
val of the General Assembly.

4th. If this special purpose is for necessary expenses, and is
approved of by the General Assembly, then the extent of the
necessity is the only limit of the tax.

5th. No debt, &c., can be incurred by a County, except for
necessary expenses, unless by a vote of the people.

6th. Necessary expenses are such as are incurred by the
Commissioners in the general supervision and control of County
affairs, as specified in Art. VII, Sec. 2.

The wisdom of the policy of placing restrictions upon the
representatives of the people as to the subject of taxation, has
been greatly doubted by the wisest statesmen. It is not my
purpose to question the policy, but to construe the instrument
which contains it. The consideration of the great interests
of the State, as connected with a liberal and enlightened sys-
tem of internal improvements, belongs not to the judicial forum.
Judges must construe the law as it is written.

UNIVERSITY R. R. Co., *v.* W. W. HOLDEN AND D. A. JENKINS.

I concur in the opinion that the proceedings in this case must be dismissed.

SETTLE J. I do not propose to discuss all o f the questions involved, but merely to state my conclusions upon some of the most important points. I concurred in the dissenting opinion of Justice READE, filed at the last term of this Court, in *Galloway* v. *Jenkins, ante* 147, which case covers some of the questions involved in this. Regarding them, however, as *res adjudicatœ,* I have not sought to disturb that opinion, but have acquiesced in its conclusions.

In this case, I am of the opinion that the first objection presented by the Chief Justice is fatal, and that the motion for a mandamus must be dismissed.

This brings us to the consideration of a still more important question, to wit; The power of taxation under the Constitution. It was contended upon the argument that Art. 5, Sec. 1, of the Constitution, establishes an equation between the tax on the poll and property, which cannot be disturbed for any purpose. The reply is, that it is not to be presumed that the sovereign intended to part with this vital power, and we cannot construe vague and uncertain language so as to produce that result.

It is apparent that this construction would effectually destroy the most cherished objects of the Constitution. It would virtually *repudiate* the old debt, notwithstanding the Declaration of Rights solemnly pledges the honor and good faith of the State for its payment, and proclaims to the world "that it shall be regarded as inviolable and never be questioned;" and notwithstanding the further fact that the General Assembly is required by the 4th section of the same Art. of the Constitution, to provide for the prompt and regular payment of the "interest on the public debt," and after 1880, to "lay a specified annual tax," to be devoted to the payment of the public debt. This is a solemn injunction, but not more so than many others in the Constitution. The demands of the present and future are equally as binding upon us as those of the past. I acknowledge them all to their full extent.

The Constitution, Art. 9, Sec. 2, requires the General Assembly to "provide by taxation and otherwise, for a general and universal system of public schools, wherein tuition shall be free of charge to all the children of the State, between the ages of six and twenty-one."

This provision of the Constitution, involving as it does the honor and prosperity of the State, must become a dead letter, ignorance and vice must take the places of intelligence and virtue, and this promise made to the ear but intended to be broken in the heart, must stand as a perpetual reproach. The Constitution, it is true, in Art. 11, Sec. 3, imposes upon the General Assembly the duty of providing for the "erection and conduct of a State's Prison or Penitentiary." And in Sec. 10, of the same Art., it is declared that the General Assembly "shall provide that all the deaf mutes, the blind and insane of the State shall be cared for at the charge of the State. But the erection of the Penitentiary, now in progress, must cease; and our Asylums must drive out their afflicted inmates and close their doors upon them. Bread is asked, but a stone is given.

These beneficent provisions of the Constitution are all to go down, in order to preserve "the equation of taxation," as it is called. But the mischief does not stop even here. It is admitted that the government itself cannot exist twelve months under this construction of the Constitution. Are we to say that the framers of that instrument intended such results, and incorporated into it one provision overriding all others, and before which everything else must bow, even the government itself? By no means. The established rules of construction require us to look to the whole instrument; by doing so, in this instance, all the parts may be reconciled, and each perform its proper functions.

I conclude that the "equation of taxation" applies only to the ordinary expenses of the State government. It does not apply to the public debt.

Having discarded the "equation of taxation," except for limited purposes, I must go where the principle carries me.

· I am unable to see how a line can be drawn leaving the *old*⸰ *debt* and the debt in behalf of *unfinished* roads on one side,· and everything else on the other. This establishment of the· line appears to me to be arbitrary. I understand the term· public debt, to include, not only the old debt, as it is called · and known, and the debt contracted, or to be contracted, in. behalf of unfinished roads, but also the debt incurred or to be incurred by the Legislature, in the exercise of its "power⸰ (1) to contract new debts, provided par value is obtained for· them, without levying any tax; and (2) to contract new debts⸰ even if its bonds are below par, provided it lay a tax in the same bill to pay the interest."

I believe there is no diversity of opinion as to the power of the Commissioners to levy taxes for county purposes.

·I will not repeat the position, as it is asserted in the Opin-· ions of the Chief Justice and Justices Reade and Dick.

Per Curiam.