W. E. BEE *v.* CITY OF HUNTINGTON

O. O. EAKLE *v.* COUNTY COURT OF BRAXTON COUNTY *et al.*

*and*

JESS SNIDER *v.* W. M. MARTIN, *Assessor, et al.*

(No. 7752)

Submitted August 30, 1933. Decided September 19, 1933.
(Rehearing denied October 27, 1933)

MAXWELL, JUDGE, dissenting.

W. E. Hines and Van B. Hall, Koontz, Hurlbutt & Revercomb and W. Elliott Nefflen, for appellant Eakle.

James E. Cutlip, Prosecuting Attorney, and G. G. Davis and Homer A. Holt, Attorney General, for appellees County Court of Braxton County et al.

George S. Wallace, for plaintiff Bee.

Wm. C. Graham, Maxwell W. Flesher, Chas. Ritchie and Philip H. Hill, for plaintiff Snider and defendant City of Huntington.

E. E. Winters, Jr., for defendants Martin et al.

LITZ, JUDGE:

The first of these cases is a suit of a taxpayer, in the city of Huntington, to enjoin the levying of municipal taxes, for the fiscal year 1933-34, in excess of the alleged maximum levies permitted under the constitutional amendment adopted at the general election of 1932, classifying property for taxation and limiting the respective levies in the several classifications. The bill has been presented to this court for a preliminary injunction (under chapter 53, article 5, section 5, Code 1931), following the refusal thereof by the circuit court of Cabell County.

In the second case a taxpayer of the town of Sutton, Holly District, Braxton County, seeks like relief against the munici-

pality, the county court of Braxton County, and others. This case is here upon application for an appeal from a decree of the circuit court of Braxton County, denying relief upon final hearing on the bill, answer and proof.

The third case is a suit by the owner of real estate, situate in Huntington, attacking the validity of the amendment in so far as it authorizes the classification of property for taxation to discharge prior governmental bonded indebtedness.

As the first and second cases involve the same questions, they will be considered, together, before discussing the third.

The amendment follows: ''Section 1. Subject to the exceptions in this section contained, taxation shall be equal and uniform throughout the state, and all property, both real and personal, shall be taxed in proportion to its value to be ascertained as directed by law. No one species of property from which a tax may be collected shall be taxed higher than any other species of property of equal value; except that the aggregate of taxes assessed in any one year upon personal property employed exclusively in agriculture, including horticulture and grazing, products of agriculture as above defined, including live stock while owned by the producer, and money, notes, bonds, bills and accounts receivable, stocks and other similar intangible personal property shall not exceed fifty cents on each one hundred dollars of value thereon and upon all property owned, used and occupied by the owner thereof exclusively for residential purposes and upon farms occupied and cultivated by their owners or bona fide tenants one dollar; and upon all other property situated outside of municipalities, one dollar and fifty cents; and upon all other such property situated within municipalities, two dollars; and the legislature shall further provide by general law, for increasing the maximum rates, authorized to be fixed, by the different levying bodies upon all classes of property, by submitting the question to the voters of the taxing units affected, but no increase shall be effective unless at least sixty per cent of the qualified voters shall favor such increase, and such increase shall not continue for a longer period than three years at any one time, and shall never exceed by more than fifty per cent the maximum rate herein provided and prescribed by law; and the revenue derived from this source shall be apportioned by the legislature

among the levying units of the state in proportion to the levy laid in said units upon real and other personal property; but property used for educational, literary, scientific, religious or charitable purposes, all cemeteries, public property, the personal property, including live stock, employed exclusively in agriculture as above defined and the products of agriculture as so defined while owned by the producers may by law be exempted from taxation; household goods to the value of two hundred dollars shall be exempted from taxation. The legislature shall have authority to tax privileges, franchises, and incomes of persons and corporations and to classify and graduate the tax on all incomes according to the amount thereof and to exempt from taxation, incomes below a minimum to be fixed from time to time, and such revenues as may be derived from such tax may be appropriated as the legislature may provide. After the year nineteen hundred thirty-three, the rate of the state tax upon property shall not exceed one cent upon the hundred dollars valuation, except to pay the principal and interest of bonded indebtedness of the state now existing.'' Section 1, chapter 9, 1932 Extraordinary Session of the Legislature.

In *Finlayson* v. *City of Shinnston*, 113 W. Va. 434, 168 S. E. 479, this court, construing the amendment, held that the limitation of assessments therein prescribed embraces levies for *all purposes*, including previous governmental bonded debts, except in cases in which such limitation of levies would result in the impairment of existing legal obligations. Following this decision, the legislature by an Act of March 11, 1933 (chapter 38, Acts 1933), relating to tax levies, authorized the various tax levying bodies to ''impose the levy necessary for current expenses'' to the extent of the maximum levies prescribed in the amendment, and to lay additional levies to ''meet current requirements of now-existing indebtedness.'' The levying bodies sought to be enjoined have pursued this course by imposing the maximum levies for current expenses and additional levies to meet current requirements of existing indebtedness. It will thus be observed that the interpretation of the amendment by the legislature is incompatible with the previous construction of this court in the *Finlayson* case.

Plaintiffs contend that a levying body may not levy beyond the respective aggregates specified in the amendment without the special authorization, therein prescribed, from the qualified voters of the particular governmental unit.

Defendants insist that they may levy, in accordance with the statute, to the limit of such aggregates for current expenses of government, and, in addition thereto, taxes necessary to meet current requirements of existing indebtedness, or, at least, of indebtedness incurred prior to the amendment. They rely upon three grounds, which will be considered in the order named, as follows: (1) That the language of the amendment, in the light of other provisions of the constitution, should be so construed; (2) that the maintenance of modern, orderly government is necessary for the preservation of property values and the collection of taxes to prevent the impairment of debts created prior to the amendment, and (3) that the essentials of government must be provided for regardless of the constitutional limitation.

The attorney general has cited *Mauney v. Board of Commissioners*, 71 N. C. 486; *French v. Board of Commissioners*, 74 N. C. 692, and *Clifton v. Wynne*, 80 N. C. 145, as supporting the first ground. These cases involved the interpretation of the following constitutional declarations:

(1) "The general assembly shall levy a capitation tax on every male inhabitant over twenty-one and under fifty years of age, which shall be equal on each to the tax on property valued at three hundred dollars in cash. The commissioners of the several counties may exempt from capitation tax in special cases, on account of poverty and infirmity, and the state and county capitation tax combined shall never exceed two dollars on the head.

(2) "The taxes levied by the commissioners of the several counties for county purposes shall be levied in like manner with the state taxes, and shall never exceed the double of the state tax, except for a special purpose and with the special approval of the general assembly." The court read into these provisions an implied limitation upon the taxation of property to two dollars on three hundred dollars valuation for current expenses and indebtedness, but did not extend the implication to legal indebtedness existing prior to the adoption of

the constitution, in 1868. It will be observed that the North Carolina court applied a liberal interpretation of the constitutional limitation in favor of the taxpayers, as there does not appear to be within the language of the provisions quoted any limitation upon property levies, the limitation being confined to capitation tax. Note the difference between the language in the North Carolina constitution, from which a limitation upon the taxation of property was implied, and the express declaration in ours ''that the aggregate of taxes assessed in any year'' upon the several classifications of property ''shall not exceed'' the respective rates therein enumerated. In amplification of the many reasons for applying the limitation, affirmatively expressed in the amendment, to past as well as current debts, we quote at length from the comprehensive and convincing opinion of Judge Haymond Maxwell in the *Finlayson* case, as follows:

''Taxes levied by the various tax levying bodies of the state have very generally increased by leaps and bounds within the last decade. And not only that, but the people themselves of many taxation units have authorized bond issues, the interest and sinking funds of which now add substantially to the burdens of taxation. The serious economic depression of the last three years has greatly accentuated the tax situation. The people have come to realize that a public spending program of exaggerated proportions, such as came into being in the World War period and in the succeeding years of inflation bears heavily upon the people in a period of adversity.

''With these undesirable conditions existing, it must be considered that when the people of the state adopted a constitutional amendment providing that 'the aggregate of taxes assessed in any one year * * * shall not exceed' the maximum levies prescribed by the amendment for different classes of property therein enumerated, the people meant that such prescribed maximum levies should be in fact the outside limit, for all purposes, save only as such course might imperil the integrity of solemn obligations and thereby violate paramount law. We say this because the plain language 'aggregate of taxes' means all the taxes. Simply that and nothing less. Such plain and unequivocal language leaves no room for interpretation.

"This conclusion is emphasized by the fact that although the amendment contains a provision limiting the state tax to one cent on the hundred dollars valuation, after 1933, 'except to pay the principal and interest of bonded indebtedness of the state now existing', no such exception appears with reference to the bonded indebtedness of any of the governmental subdivisions of the state. *Enumeratio unius est exclusio alterius.* The conclusion stated is accentuated, too, by the fact that the state senate rejected Senate Joint Resolution No. 1 proposing a constitutional amendment in large measure the same as the amendment later submitted to the people by the Legislature, except that the rejected resolution contained the language: 'The limitations contained herein shall not apply to levies for Virginia debt, or levies heretofore or hereafter authorized by a vote of the people under the provisions of section eight, article ten, and the good roads amendment, of this constitution.' It therefore seems to have been the intent of both the legislature and the voters that all levies for governmental subdivisions of the state should come within the maximums fixed by the amendment, except as might be otherwise required by paramount law.

"Other provisions of the state Constitution must be construed in the light of the amendment."

Regarding constitutional construction, this court said, in *C. & O. Ry Co. v. Miller,* 19 W. Va. 408, 419: "Where the text is plain and unambiguous, courts are not at liberty to search for its meaning beyond the instrument itself." This rule was emphasized by the New York Court in *Newell v. People,* 7 N. Y. 9, 97, as follows: "That which the words declare, is the meaning of the instrument; and neither courts nor legislatures have a right to add to or take away from that meaning." The doctrine, thus stated, is universal. Cooley's Constitutional Limitations (8th Ed.), 124, etc.; 12 C. J. 703; *Board of Commissioners v. Rollins,* 130 U. S. 662, 32 L. Ed. 1060. The "plain and unequivocal language" of the amendment, as was said in the *Finlayson* case, "leaves no room for interpretation". We cannot, under such circumstances, weigh the policy of the legislature. Our duty, as pointed out in *People v. Draper,* 15 N. Y. 532, 546, is merely "the humble one of

construing the constitution by the language it contains.'' The language of the amendment makes no exception in favor of the exigencies or the necessities of local government save the authority of the legislature to provide indirect taxation and the people to vote an increase of levies. By that language (alone) the several limitations on direct taxes are absolute. The judiciary has no part in the policies of government. The power of the legislature, exercised within constitutional limits, is exclusive and supreme in this sphere.

The second ground is without merit. Not only are there no creditors (whose claims were created prior to the adoption of the amendment), complaining, but there is also an absence of proof that the maintenance of what may be considered by the various fiscal bodies of the state as constitutional government is necessary for the preservation of property values and the collection of taxes to prevent the impairment of such debts. By virtue of section 8, Article X of the constitution, these claims may not exceed five per cent of the value of the taxable property. Defendants cite numerous cases for their contention, including *Von Hoffman v. Quincy,* 71 U. S. 535, 18 L. Ed. 403, and *Welch Water Co. v. Town of Welch,* 64 W. Va. 373, 62 S. E. 497. These authorities merely apply the universal rule that legal government obligations must be discharged regardless of statutory or constitutional limitations upon taxation.

It is argued, substantially, that the limitation should be ignored in levying taxes necessary for orderly government, which would mean that a limitation of levies for the operation of government cannot be effected even by constitutional proclamation. This position also is without legal basis. In the case of *Brannon v. County Court,* 33 W. Va. 789, 11 S. E. 34, 36, Judge Brannon, speaking for the court in answer to a like contention, said that county courts must have an eye to constitutional limitations, ''and so apportion the assessment as will, in their judgment, best answer the public interest, *but must keep within the limit*; and, if that be not adequate for public wants, all that can be said is, 'so the constitution is written.' '' In *Board of Commissioners v. Rollins,* cited, the Supreme Court of the United States, responding to a similar

argument, observed: "We cannot say, as a matter of law, that it was absurd for the framers of the constitution of this new state (Colorado) to plan for the establishment of its financial system on a basis that should closely approximate the basis of cash. It was a scheme favored by some of the ablest of the earlier American statesmen. Nor can the fact disclosed in the bill of exceptions, that, after the adoption of the state constitution the county officials, and many of the people, designedly or undesignedly, disregarded the constitutional rule, render the plan absurd. *If it was a mistaken scheme, if its operation has proved or shall prove to be more inconvenient than beneficial, the remedy is with the people, not with the courts.*" In *French v. Board of Commissioners,* (heretofore cited as an authority relied on by defendants) the court stated: "If what are often miscalled the 'necessary expenses' of a county exceed the limitation prescribed by law, *the necessity cannot justify the violation of the Constitution.* In such cases two remedies are open to the county. One is to apply to the Legislature, if the tax is required for a special purpose. The Constitution, Art. V, sec. 7, empowers the Legislature in such cases to give a special approval for an increased levy. The other and better way, however, is to reduce the expenditures. The old proverb, 'cut the garment according to the cloth', has in it much practical wisdom. It is illustrated every day in private life, and is the foundation of individual integrity, contentment and success."

It is proposed to evade the constitutional limitation by levying first for current governmental costs upon the theory that such expenses have preference over existing legal indebtness, which, as heretofore shown, must be provided for in all events. If such practice were permissible, constitutional tax limitation would be impossible; for if we assume that the various fiscal bodies of the state have the power, notwithstanding the limitation, to levy taxes for the maintenance of orderly government, it is for them and not the courts to say what expenditures may be necessary for that purpose. "The question, what expenditures are proper and necessary for a municipal administration, is not judicial; it is confided by law to the discretion of the municipal authorities. No court has the right

to control that discretion, much less usurp and supersede it.'' *City of East St. Louis et al v. United States ex rel. Zebley,* 110 U. S. 321, cited by defendants.

If, as is claimed, the various subdivisions of government are confronted with a large accumulation of current indebtedness, some of these obligations must have been contracted in violation of section 13, article 8, chapter 11, Code 1931, which not only prohibits fiscal bodies from entering into any contract involving the expenditures of funds not available for the current year, but declares that such contract shall be illegal and void. The statute has been strictly enforced in numerous decisions of this court. *Shonk Land Company v. Joachim,* 96 W. Va. 708, 123 S. E. 444; *Huddleston v. County Court,* 98 W. Va. 706, 128 S. E. 925; *Swiger v. Board of Education,* 107 W. Va. 173, 147 S. E. 708; *McCoy v. Town of Riverside,* 109 W. Va. 670, 158 S. E. 539. The amendment should serve to prevent the illegal practice on the part of levying bodies of contracting debts beyond the current revenues as well as to reduce legitimate costs of government.

Finally, assuming that a constitutional limit on taxation could be legally exceeded for the exigencies of an emergency in government, such is not the situation presented. The people may, under the amendment, vote an increase of fifty per cent in direct levies, and, through their representatives in the legislature, augment the revenues by indirect taxation. Chapter 38, Acts 1933, provides for such vote after two weeks' notice. This court would not be justified in assuming that local communities in need of additional levies to maintain constitutional government would deliberately refuse to cast the requisite vote. The theory of organized society rests in the assumption that the community is capable of self-government. As the legal indebtedness must be paid, levies may be made to the extent of the current requirements for that purpose notwithstanding the limitations. *Corrugated Culvert Co. v. County Court of Logan County,* 114 W. Va. 138, 171 S. E. 110, decided at this term. So, in the event of elections for increased levies, the people naturally will respond more readily to the emergency, knowing that the proposed taxes can

be used only for the purpose of providing the essentials of government, and not to pay past debts.

The plaintiff Snider, in the third case, alleges that he is a resident and taxpayer of Cabell County and the owner of real estate in the city of Huntington; that at the time the bonded indebtedness of the municipality (existing prior to the ratification of the amendment) was incurred, section 1, Article X of the Constitution required uniform taxation; and that to permit levies according to the classifications prescribed in the amendment to meet the current requirements of such indebtedness would constitute an impairment of contract between the city and its citizens. No authority is cited upholding this view. The plaintiff does not allege when he became a resident and taxpayer of Cabell County or the owner of real estate in the city of Huntington. Moreover, reasonable classification of property for the purposes of taxation and the imposition of different rates on different classes is not denial of due process of law. 61 C. J. 158; *Hope Natural Gas Co. v. Hall*, 102 W. Va. 272, 277, 135 S. E. 582.

An injunction will, therefore, be awarded in the first and second cases and denied in the third.

> *Injunctions awarded in the first and second cases; denied in the third.*

KENNA, JUDGE, concurring:

I concur in the majority opinion. In doing so, I have a full appreciation of the very serious nature of the difficulty involved and of the far-reaching consequences with which the question is fraught. On the one hand, it is urged that we are faced by the probability of a breakdown of local government in a large number of the taxing units throughout the state through lack of money realized from taxation to provide for their essential functions, and, on the other, that the sovereign will of the people, expressed by them in the very instrument to which these taxing units owe their existence, will be thwarted in a matter of vital importance.

The Legislature in passing, and the governor in approving, chapter 38 of the Acts of the Legislature of 1933, have united in placing an interpretation and construction upon the so-

called tax amendment. This interpretation is entitled to great respect and must be upheld if, upon any theory, it is consonant with the true meaning of the tax amendment and the real purpose thereof as viewed by this Court.

It seems to me manifest that the primary purpose of the tax amendment was to procure by limitation of levies a reduction of the taxes upon property throughout the state. Because of the fact that the levies for state purposes have always been negligible as compared to the levies of local bodies, it is plain that the tax amendment had for its principal purpose the limitation of the power of local levying bodies to impose taxes upon property. There can be no doubt that the levies laid by counties, school districts and municipalities upon real and personal property, created the burden from which the people expressed their determination to rid themselves by the overwhelming adoption of the tax amendment. This well-known fundamental purpose is, to my mind, the cardinal rule by which the tax amendment must be interpreted. At the same time, it must be presumed that it was not the purpose of the tax amendment to invite attempted repudiation of debts, to bring about an abandonment or abdication of local self-government, nor to destroy the credit of the various taxing units throughout the state.

The Act of the Legislature prescribes the limitations within which the various levying units of the state may lay property taxes. It allots to the local levying bodies their respective parts of the primary limitations of the tax amendment itself. The Act further sets up the machinery for laying levies within the limitations and prescribes the conditions under which levies may be laid beyond them.

Section 13 of the Act, in effect, provides that the local levying bodies shall each prepare an estimate which shall include as to the unit (1) the amount necessary for current expenses, and (2) the amount necessary to provide the current requirements of now-existing indebtedness. (This expression is used in the same sense that the act of the legislature uses it, i. e., to mean debts contracted prior to the adoption of the tax amendment.) The section then goes on to provide a method by which the limitations may be exceeded if the estimate dis-

closes that it is necessary to do so in order to provide the requirements of now-existing indebtedness. Thus the Act sets up a system of bracketing the estimated amounts and the stated purposes for which levies are to be laid and gives the levies preference within the limitations according to their purpose, putting current expense first in order. In other words, this section virtually places in two brackets the estimates upon which the levy is to be ascertained: (1) current expense, and (2) requirements of now-existing debt. Under this plan, the requirements of now-existing debt would be added to the requirements for current expense, and, presuming that the latter did not exceed the limitations, if the requirements for now-existing indebtedness, when added, did exceed the limitations, then the estimated levy would have to be laid notwithstanding that fact, because to fail to do so would be to threaten to impair the obligation of contract. This makes it possible for the local levying bodies to absorb for current expenses any part or all of the levies that may be laid within the limitations. They may then add the required levies to provide for existing indebtedness, no matter by what the aggregate of the two exceeds the limitations. In the contemplation of the tax amendment, a much larger sum than is essential for current expenses may be collected by any taxing unit without exceeding the limitations for that purpose alone. By the very terms of the amendment, the limitations were designed to include the aggregate of all the taxes to be levied. Therefore, to give the local levying bodies the unrestrained right to levy within the limitations for this purpose alone, is, for all practical purposes, an abandonment of the limitations in so far as they relate to the matter of current expense. As pointed out in the majority opinion, there is no power in the courts to review the discretion of local levying bodies in fixing the amount for which they shall levy to cover the requirements of current expense. Their discretion in this respect, according to the generally accepted rule (with which I reserve the right to disagree in the future), can be exercised arbitrarily and even flagrantly abused without being subject to review by the courts. The reason for this rule is that taxation is a legislative function, and to permit the courts to regulate it in the matter of governmental expense would be to place in the

judicial branch the power directly to control, and even drastically to curtail, the functions of the other two departments of the government, resulting in a centralization of power in the judiciary and virtually abolishing the independence of the three co-ordinate branches of government. Then the local levying bodies would be given practically arbitrary power to determine the amounts necessary for the running of the local government and to levy therefor. The limitations of the tax amendment cannot be regarded as limiting levies for current expenses alone (though this was their principal purpose), because, obviously, it was hoped that all levies might be brought within the limitations. As I have pointed out in the outset, this, to my mind, is exactly the power that had resulted, prior to the tax amendment, in the unendurable levies upon property, against which the tax amendment was aimed in an effort to procure their reduction by limitation. If this reduction by limitation is not achieved, then, to my mind, the primary purpose of the tax amendment has failed.

That the purpose of the people in adopting the tax amendment was to bring about reduction in direct levies through limitation of the power of the local levying bodies to levy for current expenses is borne out by at least two important further considerations. All levies may, for the purpose of convenience, and in contemplation of the adoption of the tax amendment, be divided into three categories: (1) To provide funds for meeting the requirements of now-existing indebtedness; (2) to provide funds for meeting current expense, and (3) to provide funds to cover indebtedness (non-current) contracted after the tax amendment should be adopted.

At which of these three categories of levies were the limitations of the tax amendment primarily aimed? It would seem plain that they were not aimed at the levies required to take care of now-existing indebtedness, for the very simple reasons that this is a type of obligation that cannot be reduced and that the provision of the Constitution of the United States against the impairment of the obligation of contracts would require that all indebtedness in this category be eventually paid regardless of tax limitations not existing at the time the contract therefor was made. It would seem that the

limitations of the tax amendment were not aimed at levies for non-current indebtedness contracted since the tax amendment, because the local levying bodies have within themselves no power to impose levies for this class of expenditures. Code 1931, 11-8-13; Const. W. Va., sec. 8, Art. X. This class of levies must be imposed by a vote of the people. It is not the local levying body that has power to lay this class of levy, but the people themselves. The levying body is merely the machinery for carrying out the will of the people in imposing the levy. It follows that, if the above reasoning is correct, the class of levies laid for current expense is the class of levies that the tax amendment was aimed at reducing by limitation. This is so because it is the only class of levy to which the limitations can have any practical relevance and as to which they can have any workable effect.

Employing similar considerations to an effort to determine the purpose of the provision of the tax amendment prescribing that the legislature shall provide by law for not more than a fifty per cent extension of the limitations in the various taxing units by popular vote, we reach practically the same conclusion. To submit to popular vote in the taxing unit the question of whether levies would be authorized to pay now-existing indebtedness, would be to submit a question in which the people eventually would have no option. Contractual obligations must be discharged within the limits of the levying power existing at the time the contract was entered into. This class of obligations must be paid. If, upon submission, the people should refuse to extend the limitations by popular vote, if necessary to prevent the impairment of the obligation of a contract, the extension would be compelled by mandamus. It seems impossible to believe that the tax amendment contemplates submitting to the people the question of whether they will pay their just debts. It seems, therefore, fairly obvious that this question is not the question intended to be submitted to the people. As to non-current indebtedness contracted since the constitutional amendment was adopted, it seems equally obvious that this question was not the primary one intended for popular submission. The levying bodies within themselves have no power to impose this class of levies. They

must be authorized by popular vote in the first instance. Of course, after the expenditure has been authorized by popular vote, if a levy is required exceeding the limitations, it would be necessary to submit that question also to popular vote. It seems obvious, however, that the people, in adopting the limitations, were principally concerned with what was within the power of the levying bodies without first requiring a popular election to confer that power. It was the existing power of the taxing bodies that they wished to limit. It was not necessary to limit their own power to vote levies, for that could be withheld at will. If this be true, then the provision for submitting an extension of the limitations to popular vote was intended to apply to the class of levies that the levying bodies could impose without submission to popular vote. In other words, it was not the thought that the people of the taxing unit would by vote authorize future expenditures (non-current) that would require for their payment another vote of the people to extend the limitations. If the foregoing observations are valid, then the provision of the tax amendment relating to extending the levies by popular vote was intended primarily to operate upon those levies made for current expenses. It would seem that the provision was intended as a means of meeting emergencies that might arise exactly here. It was certainly not intended to be divorced from exigencies that might arise under the amendment. Yet, by the act, the provision in question is totally detached from any such possibilities. There is no practical purpose in submitting to popular vote the question of extending the limitations for either now-existing debt requirements or future (non-current) expenditures. The Act renders it unnecessary to do so for current expenses. Therefore, under the Act, the provision is practically useless.

On the basis of the foregoing considerations, and of those contained in the majority opinion, it is my conclusion that it was the purpose of the people in adopting the tax amendment, and that the tax limitation amendment was framed with a view to achieving, a reduction in taxation by placing a limit upon the power of local levying bodies to levy for current expenses. It was the question of getting relief in their

direst need that animated the people. Their need for relief was immediate and extreme. The tax limitation amendment was drafted and submitted in an effort to meet that need. Its provisions were therefore intended to operate immediately and drastically.

If the levy for current expense be submerged from the limitations by placing it in the first bracket to be levied for, and adding the levy for now-existing indebtedness in the second bracket, then you have in the bracket which would exceed the limitations, a class of levy to which the limitations cannot have practical application, because, in the first place, the people want to pay their honest debts, and, in the second place, to limit the levy laid for the purpose of discharging now-existing debt more than it was limited at the time of contract would impair the obligation of the contract. This is the plan set up in section 13 of the act under consideration. I do not think it carries into effect the principal purpose of the tax limitation amendment. On the other hand, by placing the requirements of pre-existing indebtedness in the first bracket and current expense in the second, a situation would be brought about in which it would be the matter of current expense that would exceed the limitations, if they were exceeded. This would require one of two things; either that the levying bodies stop at the limitation or that they submit to popular vote, under the provisions of the constitution, the question of whether the limitations would be extended for the purpose of meeting current expense. It seems to me that this is the situation that the tax limitation amendment was designed to bring about. Since it was intended to cast its limits on the power of the local levying bodies to levy for current expenses, the enabling act should be so framed as to prevent the local levying bodies from having virtual *carte blanche* in this field. This, in my judgment, cannot be done by submerging the levy for current expenditures by placing it in the first bracket and superimposing the levy for the requirements of now-existing debt. To bear out the true intent of the tax amendment, it seems to me that the levy for current expense necessarily must go in the second bracket. Then, and then only, the limitations operate directly upon it in a practical sense.

I am not unmindful of the vast complexities involved in drafting a workable enabling act under the tax amendment. I am very keenly aware of the number and divergency of the fiscal problems existing in the hundreds of taxing units throughout the state. Actual and hypothetical difficulties, some of them supposedly involving the very existence of local government in the taxing units, exist without number. It is said that in certain instances a fifty per cent extension of the limitations, together with other local revenue, will not be sufficient to provide local self-government. That does not seem to be true in the cases before the court. If it were shown to be true, doubt would still exist in my mind as to whether, in the face of what I believe to be the plain meaning and explicit language of the tax amendment, the courts could grant any form of relief. That would be for the legislature. It might spring from a system of too low assessment values, in which case the remedy would be local. The question before us is not one of policy. It is not ours to indulge in speculation nor to attempt the solution of supposititious problems. We are to take the instrument before us and say whether it conforms to the tax amendment or not. For the reasons stated in the majority opinion and set forth in these observations of my own I think that section thirteen of the act fails in this respect.

In addition to the foregoing, there are certain textual difficulties in the act itself that seem to me to be well near insuperable. Section 13, after providing that the local levying bodies shall impose the levy necessary for current expense and requirements of now-existing indebtedness, goes on: "If the levy laid (I italicize) *exhausts the maximums prescribed in section five* of this article without meeting current requirements of principal and interest on now-existing indebtness, the local levying body shall * * *." The section then sets out a method by which the additional levy shall be laid. Turning to section 5 of the act, we find that it recites the primary limitations of the constitutional amendment itself. These primary limitations have no direct bearing at all upon the local levying bodies. The local bodies are governed by the limitations (secondary limitations) contained in the act

58

of the legislature in sections 7, 9 and 11, respectively. For example, a county court may levy to the extent of 9.4 cents on class one property. The primary (constitutional) limitation on this class of property is fifty cents. The school districts and municipalities, under the Act, absorb the remaining 40.6 cents of the primary limitation. Yet it is only when the county court has *exceeded this primary limitation of fifty cents* (which it may not in any event do because of the allocations of the primary limitation made in the act itself) that it may, under the theory of the act, proceed to lay levies in excess thereof. This creates an inextricable confusion. By inference, it gives to each levying body the privilege of laying levies in excess of the primary limitations of the constitution itself. This might perhaps be done on the theory of the act, but the difficulty is that the section ignores the secondary limitations prescribed by the act itself. It does not provide for laying additional levies when the secondary limitations (all that any levying body can lay under the terms of the act) are exceeded.

My conclusion is that section thirteen of the Acts of the Legislature of 1933 is unconstitutional because it conflicts with the correct interpretation of the tax amendment to the constitution, and, further, that that section is void because irreconcilable with the other provisions of the Act itself.

MAXWELL, PRESIDENT, dissenting as to first two cases:

In the case of *Finlayson v. City of Shinnston*, 113 W. Va. 434, 168 S. E. 479, we held that levies for bonded indebtedness created subsequent to the adoption of the amendment of section 1, Article X, West Virginia Constitution, must be within the maximums prescribed by said amendment. Also, that levies for pre-existing bonded indebtedness must be made within the said maximums except where greater levies are necessary to prevent impairment of the obligations of contracts. The distinction between subsequent indebtedness and pre-existing indebtedness is obvious. In the case of *Dickinson v. Talbott, Treas.*, 114 W. Va. 1, 170 S. E. 425, we re-emphasized the non-violableness of contractual obligations exist-

ing at the time of the adoption of the amendment by saying: "The levy limitations prescribed by said amendment cannot be destructive of contractual obligations." In that case we also said, in further conformity with general law, "The state's constitutional requirements are for the preservation of the state and the maintenance of its integrity and for the protecttion of the people. Constitutional limitations must not be so construed as to be subversive of their very purpose." That case is also authority for the proposition that the non-impairment of the obligation of contracts is not limited to bonded indebtedness. The *Finlayson* case involved only bonded indebtedness. The *Dickinson* case involved indebtedness not bonded.

Since the *Finlayson* case was decided the legislature has passed certain acts for the raising of revenue by indirect taxation and has passed the act in question (Acts 1933, chap. 38).

While ordinarily the question of the impairing of the obligation of contracts may be raised only by a party in interest (12 Corpus Juris, p. 1057), that rule must not be so strictly applied as to prevent a court of last resort from resolving a question of great public importance in conformity with the said requirement of the federal and state Constitutions. For us to fail to give recognition at this time to the paramount law because, forsooth, the question of the impairment of the obligation of contracts has not been pleaded by a litigant who asserts that a contract in which he is interested has been impaired, would mean that we would simply gloss over that vital question at this time and leave it for determination on what might be conceived to be more opportune occasions, though the delay would involve great public detriment.

However drastic may be the program of retrenchment in expenditures of public funds, the fact remains that large amounts of revenue must be raised by the state, counties, school districts, magisterial districts and municipalities in order that governmental activities may function, though on a most conservative basis.

It is a matter of common knowledge, of which this Court must take judicial notice, that in many of the taxation units of the state the restricted levies will not produce enough reve-

60

nue to meet interest charges and sinking fund requirements
of bonded indebtedness in addition to providing for necessary
governmental activities, even on a basis of emphasized con-
servatism. In the instant case of *Eakle v. County Court of
Braxton County,* such facts appear from the record, uncon-
tradicted. This condition, with respect to the state at large,
must be considered to have been known to the legislature and
to have been taken into consideration by the people when
they adopted the amendment at the general election of 1932.
To hold that the amendment should be construed to mean that
both bonded indebtedness (existing prior to the adoption of
the amendment) and current expenses must, in all events, be
taken care of within the limits fixed by the amendment would
create an impossible situation. And, in my judgment, it
equally tends to confusion to hold that bonded indebtedness
must be given preference over the necessary expense of
constitutional government. With routine governmental activi-
ties handicapped and demoralized by a shortage or lack of
funds, the collecting of taxes to meet the requirements of pre-
existing indebtedness would be seriously interfered with or
wholly subverted. The value of the debts whether bonded or
otherwise would be impaired or destroyed. As was forcefully
said by the Supreme Court of the United States in *Von Hoff-
man* v. *Quincy,* 4 Wallace (71 U. S.) 535, 552: ''Nothing can
be more material to the obligation than the means of enforce-
ment.''

The people of the state must be deemed not to have in-
tended to adopt an amendment which could only be so con-
strued as to involve (1) practical abdication of the functions
of government, or (2) the impairment of the obligation of
contracts of many governmental subdivisions. It is not a suffi-
cient answer to say under such narrow construction that the
duty would devolve upon the legislature to provide other
means for raising public revenue, particularly for current
expenses of government. Such other means may be available,
or they may not. That is strictly a legislative matter. The
question in hand must be determined in the light of existing
conditions.

The deterioration of the functioning of the essential activi-

ties of government would produce a condition which would jeopardize personal safety and property as well as existing obligations. Of course, the people did not mean to do that. It must therefore be considered that the people intended that constitutional government should continue to function and that the necessary costs thereof should be paid, including reasonable expenditures for the education of the youth.

What then must be said with reference to bonded indebtedness existing at the time of the adoption of the amendment? Honorable people do not repudiate debts. This is true of commonwealths as of individuals. That the people of this state did not intend to repudiate any solemn obligation is not open for discussion. Not only was there no desire for such repudiation but it could not be accomplished if attempted. "It admits of no dispute now, that taxation for state and county purposes combined, cannot exceed the constitutional limitation, for their necessary expenses and new debts. It is equally well settled that there is no limitation of the power of taxation, upon either state or county, for the payment of their lawful debt, created prior to the adoption of the constitution." *French et al. v. Board of Commissioners*, 74 N. C. 692. In an earlier North Carolina case wherein the constitutional tax limitation of that state was under consideration, the judge speaking for the court said: "I agree that if, under this equation, carried to its limits, the amount is not enough to meet current expenses, and also to pay the interest on the public debt, then for the excess needed it is not only within the power, but it is the duty of the General Assembly to disregard the equation; for this protection to property must be taken to be subject to the injunction, 'to maintain the honor and good faith of the State untarnished in regard to the public debt * * *'." *University R. R. Co. v. Holden and Jenkins*, 63 N. C. 410, 414. The background of that thought is, of course, that orderly government must be maintained. It is the *ne plus ultra* of organized society. Without it, solemn obligations become mere scraps of paper.

It must be remembered that throughout the years bonded indebtedness of the respective units of government could be, and was, created only by the vote of the people. *Lawson v. County Court*, 80 W. Va. 612, 620, 92 S. E. 786. The peo-

ple voluntarily assumed the burden. It is fixed. It cannot be avoided by later constitutional amendment of whatever character. If, therefore, a later amendment fixes levy limitations which will not raise funds sufficient to support essential constitutional government and to meet the requirements of bonds, or other proper indebtedness, I think the plain logic as well as the necessities of the situation require that there be additional levies for the protection of the obligation of the contracts. This, in my judgment, is in accord with the principle applied in the *Finlayson* case. It accords also with the law recognized and applied in the case of *Water Company v. Town of Welch*, 64 W. Va. 373, 62 S. E. 497. Syllabus one reads: "A town makes a contract for furnishing it for public use light and water. At the date of the contract statute gives the town power to tax up to a certain rate or limit. A later retroactive statute limits the power of the town to tax to a lower rate. The later statute is void as to such prior contract under Federal and State Constitutions, because impairing the obligation of the contract, and the courts will compel the town to impose taxes at a rate sufficient to meet such contract, notwithstanding such later act, so its levy do not exceed the limit fixed by the statute in force at the date of the contract."

I cannot agree with the statement in the majority opinion that "the interpretation of the amendment by the legislature is incompatible with the previous interpretation of this Court in the *Finlayson* case." The opinion in the *Finlayson* case makes plain the proposition that levies in excess of the constitutional maximums may be laid to prevent the impairment of pre-existing contracts. I now say that the preserving of essential governmental activities must be deemed an element of the inviolability of governmental contracts. I think this is plainly within the meaning of the *Finlayson* holding. That case is authority for the proposition that bonded indebtedness shall be discharged out of the maximum levies prescribed by the amendment, if possible, but it does not hold that such indebtedness shall have priority over necessary governmental operating expenses. Note this language from the *Finlayson* opinion:

"With respect to existing bonded indebtedness, it is alleged in the bill that 'the Mayor and Common Council of the City of Shinnston will levy such a proportion of the maximum rates provided by the constitutional (amendment) as may be set aside by the Legislature for municipal purposes and for the purpose of carrying on the necessary functions of government; that an additional amount will be levied by said Mayor and Common Council for the purpose of providing the necessary sinking fund and interest payment on bonded indebtedness heretofore created as provided by law. * * *' Under that allegation, there appearing no necessity to make such levy in addition to the maximum levies permitted under the constitutional amendment, there must likewise be an injunction restraining the mayor and the common council from laying a levy on account of existing bonded indebtedness over and above the maximums permitted by the constitutional amendment, until the further order of the circuit court of Harrison county. Such is the situation appearing from the allegations of the bill on which this proceeding is based."

It will be observed that the situation there presented did not disclose any necessity for the proposed levy in excess of the constitutional maximums. The very existence of fundamental governmental functions was not there involved, as here.

I therefore reach the conclusion that the unavoidable expense of government shall first be paid out of such levies and, where necessary, additional levies must be laid to make provision for the requirements of existing indebtedness. This view is entertained not in exclusion of, but in harmony with, the primary intention of the people in adopting the amendment of section 1, Article X of the State Constitution, that both the current expense of essential constitutional government and funds for existing indebtedness should be obtained as far as possible under the maximum levies prescribed by the amendment.

This is the legislative construction of the amendment. Acts of the Legislature, Regular Session 1933, chapter 38. Legislative interpretation of constitutional requirements, though not controlling, is entitled to great weight. "Legislative exposition of a constitutional provision, particularly when made

almost contemporaneously with the provision, is entitled to great deference.'' *Road Commission v. County Court,* 112 W. Va. 98, 163 S. E. 815. And as we recently said in *Bates v. Bridge Commission,* 109 W. Va. 186, 153 S. E. 305, 306: ''Every law enacted by the Legislature is presumed to be constitutional until the contrary is clearly shown. It is the duty of the court to uphold every act if by any reasonable construction and interpretation it can be seen that the act is not in contravention of the fundamental law. If there be any doubt in the mind of the court as to the constitutionality, the doubt must be resolved in favor of the act. *Slack v. Jacob,* 8 W. Va. 612. Only in a case of very plain infraction of the constitution, from which there is no escape, should the courts declare an act invalid. If there be doubt, the act must be affirmed.'' By section 13 of said act, the legislature has placed large discretion in the county courts, the boards of education and the municipal councils in ascertaining their essential requirements for current expense. This involves the exercise of wide power; high authority says not subject to judicial control. *City of East St. Louis v. U. S. ex rel. Zebley,* 110 U. S. 321; 28 L. Ed. 162. Whether this broad rule would operate in cases of fraud or other gross improprieties remains to be determined. I think the courts could properly exert a restraining power in such cases. If the legislature has placed too extensive a power in the governmental agencies mentioned, such power can be curtailed by legislation or by the people themselves.

A narrow and circumscribed interpretation may be as unfittingly and inappropriately applied to a constitutional provision as to a statute. ''In the main, the general principles governing the construction of statutes apply also to the construction of constitutions.'' 12 Corpus Juris, 699. In construing a statute courts will employ ''such construction as will uphold the law and further justice. It is as well our duty to disregard a construction, though apparently warranted by the literal sense of the words used, which would lead to injustice and absurdity.'' *Click v. Click,* 98 W. Va. 419, 127 S. E. 194, 198. If units of government are to be abolished and our whole system is to be changed it would seem that the intent of

the people to produce such results should not be imputed to them merely through interpretation of a tax limitation amendment of the Constitution. I therefore cannot favor a construction of the amendment which may bring about such serious consequences when more liberal construction would avoid chaotic conditions. As between a construction that seems strongly to tend to such consequences and the practical legislative construction (Acts 1933, ch. 38, *supra*), in my judgment the latter should be employed without hesitation. This would avoid precipitating serious financial crisis in many of the public affairs of the state. Constitutional provisions are not intended to hamper but to promote the public weal. They should be so construed.

The Supreme Court of the United States in dealing with a kindred matter proceeded on the assumption that of course the expenses of necessary government would be first discharged. It said: ''The expenses will, of course, be first defrayed out of the fund.'' *Von Hoffman* v. *Quincy*, 71 U. S. 535, 549; 18 L. Ed. 403. There is much authority for this basic principle that the reasonable expenses of essential constitutional government shall be first paid. The courts seem to take it for granted that such course must be pursued, *ex necessitate rei*. *City of Cleveland (Tenn.)* v. *U. S.*, 166 Fed. 677; *State* v. *Erickson*, 93 Mont. 466, 19 Pac. (2d) 227 and *Barnard & Co.* v. *Knox County*, 37 Fed. 563.

> ''This right to thus apply the current revenues to the defraying of ordinary expenses is grounded upon the fact that such a course is absolutely necessary to the life of the municipality and to the successful accomplishment of the purposes of its creation.'' *Grant* v. *City of Davenport*, 36 Iowa 396; *Rauch* v. *Chapman*, 48 Pac. (Wash.) 253.

> ''In this day of enlightened thought there is much controversy among students of government as to the proper and necessary limitations upon the powers of government; but it is now beyond the stage of controversy, agreed to and admitted by all learned men, that certain necessary and fundamental functions of government must always be expressed and actively exercised. The duty of protecting life, liberty, and property, and preserving peace and order cannot be

delayed, nor can the power so to do be abdicated without the destruction of the state. These functions are elementary and indestructible." *In re Application of State of Oklahoma to Issue Bonds,* 33 Okl. 797, 127 Pac. 1065-7.

To the proposition that there must be a vote of the people under the very terms of the amendment itself before there can be any increase of levies for any purpose, I answer that it would make no difference with reference to prior indebtedness whether such vote was taken or not, or if taken, whether the result was favorable or unfavorable. I say this because no vote or other action of the people could possibly alter their existing obligations, or obviate the necessity for maintaining orderly government and of underwriting the expense thereof. If, within the power of the Legislature, under section 5, Article X of the state Constitution, indirect taxation can be provided and properly allocated so as to furnish necessary revenue over and above that which can be raised by the maximum levies, all well and good; but until revenue from indirect taxation becomes a reality, we must deal with the situation as it exists. In this connection the question arises whether funds raised by indirect taxation in a populous community can be allocated by the Legislature for local expenditure elsewhere. The constitutional provision referred to reads: "The power of taxation of the Legislature shall extend to provisions for the payment of the State debt, and interest thereon, the support of free schools, and the payment of the annual estimated expenses of the state; * * *."

Two of these cases come from Cabell County and one from Braxton. The able circuit judges of those counties have each held the legislative act constitutional. In forceful written opinion, Judge Fisher said in the Braxton case: "It would seem that the measures provided for in Chapter 38 of the Acts of 1933 were not only proper; but that they are in full accord with legislative power and duty. And, assuming the correctness of this proposition, it follows that as to levies made for all governmental and contractual obligations created after the adoption of the Amended section 1 of Article 10, the limitation therein fixed could not be exceeded in any event; but, when, and if, it was found necessary in order to prevent the

impairment of contracts existing before the amendment was adopted, then such additional levies may be laid as do not with other essential levies, exceed the limits of levying bodies, existing when the contracts were entered into, or the obligations arose." I think this analysis of the situation is sound. While the obligation of existing debts is paramount, it cannot in the very nature of things be placed ahead of maintenance of government.

I would affirm the decrees of the trial chancellors and refuse the injunctions. Therefore, I respectfully dissent from the opinion and decision of my brethren in the *Bee* and *Eakle* cases. I concur in the *Snider* case.

HATCHER, JUDGE, on the petition to rehear, speaking only for himself:

The brief filed with the petition by the attorney general is a monument to his perseverance and industry. However, the brief does not shake my concurrence in the majority opinion. The brief again advances the rule requiring weight to be given a legislative construction of the Constitution. That rule presupposes legislative deliberation. There was no such deliberation on House Bill 314, the act in question. This statement is made advisedly. The Journal of the House of Delegates shows that the bill (in its original form) was reported to the House by its Committee on Finance at 10 a. m., March 10th, that the bill was taken up at 8 p. m. of that same day, and at that hour was amended "by striking out all thereof and substituting in lieu of same" the bill in its present form, and as amended was forthwith passed. The bill thus substituted is radically different from the original bill. The Journal of the Senate shows that the bill was presented to the Senate on the morning of March 11th, and was rushed through on the same day without senatorial knowledge of its contents. The Journal shows that when Senator Hodges' name was called, he explained his vote in the negative as follows: "I cannot assume as a member of the Senate the personal responsibility of the enactment of a measure such as this, * * *

without having had any opportunity to know and understand the contents of the bill. * * * I cannot concur in the viewpoint that such an act should be passed by this Senate without the benefit of a single minute's deliberative consideration, either in a Senate committee or upon the floor of the Senate.''

The Journal also contains a statement from Senator Herold that he did not know and had not been given any opportunity to acquaint himself with the contents of the bill. The Journal does not show that any senator challenged these statements or claimed acquaintance with the bill. Consequently, the bill has no standing whatever, in fact, as a legislative construction of the amendment.

The brief of the attorney general would demonstrate that certain governmental units cannot function under the limited levies prescribed by the amendment. Even so, that contingency cannot militate against the majority construction of the amendment. I cannot bring myself to the opinion that the plain directions given by the people in the amendment in 1932 become ambiguous in 1933, when it appears that some governmental units cannot survive if the directions are carried out. The language of the amendment means the same now as in 1932, irrespective of its effect. The brief asserts positively that it was not the intention of the people in 1932 to abandon municipal government. Perhaps not in every instance. But since the opinion herein was handed down, the city of Beckley has refused by an overwhelming vote to increase the maximum rates under the amendment, though fully advised that such rates would provide no funds for current municipal expenses. The fact that a representative municipality has done the very thing in 1933 which the brief says was not within contemplation in 1932, sufficiently answers its assertion. Constitutional mandates are not to be distorted because of a crisis in governmental affairs. Heed the Constitution itself, Article I, section 3:

"The provisions of the Constitution of the United States, and of this State, are operative alike in a period of war as in time of peace, and any departure therefrom or violation thereof, under the plea of necessity, or any other plea, is subversive of good government, and tends to anarchy and despotism.''

The wisdom of that mandate is underwritten by an express declaration of the Supreme Court of the United States. In December, 1866, during the turbulence following the Civil War, that Court said in *Ex Parte Milligan,* 4 Wall. 2, 120-1, 18 L. Ed. 281: ''The Constitution of the United States is a law for rulers and people, equally in war and in peace, and covers with the shield of its protection all classes of men, at all times, and under all circumstances. No doctrine, involving more pernicious consequences, was ever invented by the wit of man than that any of its provisions can be suspended during any of the great exigencies of government. Such a doctrine leads directly to anarchy or despotism.''

I see no necessity for the failure of governmental units to any great extent. There are potent expedients which have not yet been tried, among which may be considered:

(1) The police power of the state. In regard thereto I submit the following observations: (a) The exercise of the police power must have a substantial basis. *State* v. *Stahlman,* 81 W. Va. 335-6, 94 S. E. 497. Such exercise is justified in case of public necessity. *Bank v. Haskell,* 219 U. S. 104, 111. Under the present temper of the people, I would say that the power should be exercised only in case of great public necessity. (b) A demand for money under the power to tax is *for revenue.* A like demand under the police power is *for regulation.* Cooley Taxation (4th Ed.), sec. 1784. See generally Gray, Limitations on Taxing Power, secs. 1404-5-6. Revenue from taxation defrays the general expenses of government. Desty on Taxation, sec. 7; 61 C. J., subject, Taxation, sec. 2. The fees collected under the police power pay only the expenses of meeting the particular emergency. Burroughs on Taxation, 146-7, 392. (c) ''Taxation for revenue purposes and taxation under the police power for regulation purposes are distinct.'' Desty *supra,* sec. 192. (d) The police power cannot override a constitutional provision. *State v. Goodwill,* 33 W. Va. 179, 185, 10 S. E. 285; Cooley Const. Lim. (8th Ed.), p. 1229. But (e) ''Provision in state constitutions as to taxes do not apply to charges exacted as an exercise of the police power.'' Cooley Taxation (4th Ed.), sec. 29. Accord: 12 C. J., subject, Const. Law, sec. 414.

(2) Assumption by the state of the payment of county road

bonds. This would seem to be essentially fair since the State has taken from the counties the control of roads. Moreover, the constitutional amendment of 1920 directed the legislature to "make provision by law for a system of state roads and highways" and to provide a state revenue "to build, construct and maintain the same, or *assist* in building, constructing and maintaining the same." It would seem that the plenary powers thus conferred warrant the state in *assisting* counties to pay for such county road construction as was incorporated into the *state system of highways*.

The Constitution, Article 10, sections 4 and 6, forbidding the assumption by the state of certain indebtedness is not overlooked. But as to section 4, see the remarks of this Court in *Bates* v. *State Bridge Commission*, 109 W. Va. 186, 188-9, 153 S. E. 305; and as to section 6, note our comments thereon in *Road Commission* v. *Kanawha County Court*, 112 W. Va. 98, 106-7, 163 S. E. 815, 818 (in re advancement by the commission for rights of way for state roads within the county) : "In the debates at the Wheeling Convention which formulated this provision, the discussion related solely to state aid or credit to corporations for local and sectional improvements. See manuscript report of the convention, for the period February 1st to February 4th, inclusive, 1862. Department of Archives and History. See also sketch 'Formation of West Virginia,' 1 W. Va. Law Reports 72. The language as well as the history of the section demonstrate that it has reference to state aid and state payments in matters of territorial interest to the county, and not to a situation like this where the advancement made the county by the state is essentially in the interests of the entire state. Sedgwick (*supra,* 418) warns that 'a strict adherence to the mere letter of a written constitution would render our system practically intolerable.' This warning in secular matters parallels that of St. Paul's in spiritual—'The letter (of the testament) killeth.' We will heed these sages." In *McCulloch* v. *Maryland,* 4 Wheat. 316, 428, it was held that "the power of taxing the people and their property is essential to the very existence of government." There are many provisions in our Constitution which are not essential to the existence of government, no matter how expedient or desirable they may be. Therefore, when

provisions, such as sections 4 and 6, *supra*, which are not essential to the life of the state, impede the workability of a tax provision, the former, as the less important, must yield. For all which and for the further reason that the tax amendment is the latest expression of the people, I submit that no former constitutional provision can prevail against it. Cooley Const. Lims. (8th Ed.), p. 129.

█ Other subjects for indirect taxation. An examination of the codes of sister states will show fertile fields for indirect taxation which West Virginia either has not entered at all, or has cultivated insufficiently. Alexander Hamilton, than whom none wiser in fiscal matters has yet arisen in this country, extolled the advantages of indirect taxation over land taxes and said that the former ''must for a long time constitute the chief part of the revenue raised in this country.'' See The Federalist Nos. 12 and 21. In this emergency what better counsel could we take than that of Hamilton? See generally on taxation Smith's Wealth of Nations, pp. 246 to 317, inclusive, and Mills' Political Economy, Vol. 2, pp. 394 to 478, inclusive.

The specification of the foregoing expedients is designed primarily as a concrete answer to the position of the attorney general, and not as a suggestion to the lawmakers.

I see no prejudice to the people if some governmental units do fail. The failure of a unit to function does not imply a failure of government within the territory comprising the unit. That territory would simply be absorbed in some other unit. The time is ripe for the consolidation of overlapping units, and of county units, also. The present arrangement of counties was made practically a century ago, in the day of foot and horse travel and to accommodate that method of transportation. The arrangement is no longer required in this day of swifter communication. Because of the automobile, the telephone and radio, county officials could give better service now to a citizen who lived a hundred miles from the county seat than was given to the citizen ten miles from the court house at the time the present county lines were established. There is unquestionably much sentiment in favor of present county divisions. But preservation of county lines will not be preferred by the people to preservation of their

homes. The attorney general emphasizes the obligation to maintain present counties as units of constitutional government. The Constitution, Article II, section 1, defines the state in the following manner: "The territory of the following counties * * * shall constitute and form the State of West Virginia." It is apparent from that definition that the counties, as such, do not constitute the state, *but the territory within the counties.* An organization of counties must be maintained under the Constitution, but there is no constitutional obligation to maintain the boundaries of the existing county system. Article IX, section 8, expressly contemplates changes in county units. Article III (Bill of Rights), section 3, proclaims the absolute right of a majority of the community to reform or alter an existing scheme of government "in such manner as shall be adjudged most conducive to the public weal." It seems to me that the amendment, *ex proprio vigore,* authorizes the alteration or even termination of any constitutional unit or scheme which cannot survive under the reduced levies. Constitutional government will not languish because of changes in the arrangement of local units.

Readjustments under any expedient will likely produce some inequalities and injustice, but that likelihood should not deter our legislators. Note the observation of our greatest commentator on taxation, Judge Cooley: "The impossibility that government should be administered even by the most conscientious rulers without unjust consequences in particular cases is universally recognized, and the state is therefore considered to have performed its full duty when it has devised and established such general rules and regulations as seem calculated to reduce such consequences to a minimum." I Cooley, Taxation (4th Ed.), sec. 1, p. 66.

I would resolve the situation as follows: A tax for revenue is simply the price paid by the taxpayers for government. See generally *State* v. *Beardsley,* 77 Fla. 803, 82 So. 794; Desty on Taxation, sec. 18; 61 C. J., subject, Taxation, sec. 2. It would seem elementary that whenever the people will to purchase a less expensive administration, they cannot be thwarted. The people of West Virginia have submitted the reduced price they will pay for government. A unit which

cannot meet that price is no longer in the popular market. The passing of such a unit is of far less moment than the continued sales of homes and farms under a confiscatory tax rate. Thousands of business concerns and many more thousands of individuals in our state have retrenched and readjusted their affairs to meet the depression. It is not too much to expect of those who guide the destiny of our state that they meet the fiscal emergency in like manner.

Upon a second application for rehearing (Litz, Judge, speaking for the Court):

In a second petition for rehearing, the attorney general has requested us to respond in specific terms as to whether the limitations in the amendment include taxes for state purposes. We said in the *Finlayson* case that ''the plain language 'aggregate of taxes' means *all* the taxes.'' That language, which necessarily includes taxes for state purposes, has been repeated and approved in the opinion of this case.

We now re-state, from point one of the syllabus, that the limitations embrace levies for *all* purposes, meaning thereby to include state, county, district and municipal taxes.

Judge Maxwell does not concur in this view.

MEMORANDUM OF POINTS AND AUTHORITIES TO BE FURNISHED THE REPORTER OF THE SUPREME COURT OF APPEALS, WITH THE REQUEST THAT THE SAME BE PUBLISHED.

Homer A Holt, Attorney General, for the Appellees, cited, among others, the following points and authorities:

## I.

Constitutional government must be maintained.

Constitution of the United States, Article IV, Section 4.

Constitution of West Virginia, Article I, Section 1.

*State ex rel. Nance v. Brown,* 71 W. Va. 519.

*Commonwealth v. City of Newport News* (Virginia) 164 S. E. 689.

*Rauch v. Chapman,* 16 Wash. 568; 48 Pac. 253.

In Re: *Application of State,* (Okla.) 127 Pac. 1065.

*State ex rel. Tipton v. Erickson,* (Mont.) 19 Pac. (2nd) 227.

*Potter v. Douglas County,* 87 Mo. 239.

Cooley's Constitutional Limitations, Eighth Edition, Vol. 2, page 1030.

## II.

The determination of what is necessary for the maintenance of essential governmental functions is for the legislative department of government.

*City of East St. Louis v. United States,* 28 L. Ed. 162, 110 U. S. 321.

## III.

The tax laws effective at the time a contract is made inhere in and become a part of the obligation thereof. Constitutional or statutory limitations of tax rates are ordinarily construed to operate prospectively. When the new limitations are insufficient to both maintain government and to pay existing debts, the governmental functions must be maintained within the new limitations, and, to the extent necessary, the debts may be paid from levies legal at the time of the making of the contract, the additional levies necessary to pay existing contractual indebtedness being an implied exception to the new limitation. The remedy is not the judicial ascertainment of new sources of revenue nor the abandonment of constitutional functions of government.

*Dickinson v. Talbott,* (W. Va.) 170 S. E. 425.

*Corrugated Culvert Company v. County Court,* 114 W. Va. 138, 171 S. E. 110.

*Welch Water Company v. Town of Welch,* 64 W. Va. 373.

*Von Hoffman v. Quincy,* 4 Wallace (71 U. S.) 535; 18 L. Ed. 403.

*Fisk v. Jefferson Police Jury,* 116 U. S. 131; 29 L. Ed. 587.

*Shreveport v. Cole,* 129 U. S. 36; 32 L. Ed. 589.

*Mobile v. Watson,* 116 U. S. 289; 29 L. Ed. 620.

*City of Cleveland v. United States,* 166 Fed. 677.

*State ex rel. v. New Orleans,* 37 La. Ann. Reps. 528.

*State ex rel. Marchand v. City of New Orleans,* 37 La. Ann. Reps. 13.

*Mauney v. Board of Commissioners,* 71 N. C. 486.

*Trull et al. v. Board of Commissioners,* 72 N. C. 388.

*French v. Board of Commissioners,* 74 N. C. 692.

*Clifton v. Wynne,* 80 N. C. 145.

Cooley's Constitutional Limitations, Eighth Edition, Volume 1, pages 582 and 136.

Cooley on Taxation, Fourth Edition, Vol. 1, page 373.

## IV.

When a statute is capable of two constructions, one of which results in an absurdity or would work manifest injustice, and the other of which is practical, it is the duty of the Court to adopt the latter as it can scarcely be presumed that absurdity or an injustice was in the legislative intent.

*Old Dominion Building, etc. Association v. Sohn,* 54 W. Va. 101, Syl. 5, 6, 7, 8, and 9, and at page 112.

*Click* v. *Click,* 98 W. Va. 419, Syl. 2, and page 430.

*Hasson v. Chester,* 67 W. Va. 278, Syl. 2.

*Rider* v. *County Court,* 74 W. Va. 712, Syl. 1, and page 721.

*Dickey v. Smith,* 42 W. Va. 805, and at page 809.

*Coal etc. Ry.* v. *Conley,* 67 W. Va. 129, Syl. 29, and pages 186-187.

*Parsons* v. *County Court,* 92 W. Va. 490, Syl. 2, and page 495.

*Fleischmann v. United States,* 270 U. S. 349; 70 L. Ed. 624, Syl. 10.